UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WALID KAMEL,<br><br>                            Plaintiff,<br><br>            -against-<br><br>BEST BUY CO., INC.,<br><br>                            Defendant. | Case No. 1:23-cv-00033 (JLR)<br><br>**<u>ORDER</u>** |

JENNIFER L. ROCHON, United States District Judge:

After a jury trial, the jury returned a verdict in favor of Plaintiff.  The Court Exhibits

from the jury trial are appended to this Order:

- Court Ex. 1: Draft *Voir Dire* Questionnaire

- Court Ex. 2: Preliminary Jury Instructions

- Court Ex. 3: Final *Voir Dire* Questionnaire

- Court Ex. 4: Draft Jury Instructions

- Court Ex. 5: Draft Verdict Form

- Court Ex. 6: Final Jury Instructions

- Court Ex. 7: Final Verdict Form

- Court Ex. 8: Jury Note of November 19, 2024 at 12:24 p.m.

- Court Ex. 9: Excerpt of Trial Transcript

- Court Ex. 10: Jury Note of November 19, 2024 at 3:47 p.m.

- Court Ex. 11: Jury Note of November 19, 2024 at 4:57 p.m.

- Court Ex. 12: Excerpt of Trial Transcript

- Court Ex. 13: Jury Note of November 20, 2024 at 11:32 a.m.

- Court Ex. 14:  Excerpt of Trial Transcript

- Court Ex. 15: Jury Note of November 20, 2024 at 1:00 p.m.

- Court Ex. 16: Completed Verdict Form

Dated: November 20, 2024
      New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WALID KAMEL,

                                        Plaintiff,

                    -against-                                    Case No. 23-cv-00033 (JLR)

BEST BUY CO., INC.,

                                        Defendant.

JENNIFER L. ROCHON, United States District Judge:

## <u>QUESTIONS FOR JURORS</u>

**Please indicate if your answer to any of the following questions is "yes" by circling the number of that question.  If your answer to a question is "no," you need not do anything. <u>Do not write your name or make any other marks on the questionnaire</u>.  The only marks you should make are circles around the questions for which the answer is "yes."  If, when asked about a "yes" answer, there is a particularly sensitive issue, please say so and we will speak at the bench.**

## A.  <u>General Questions</u>

1.    Do you have any commitments that would interfere with your serving as a juror on this trial that is expected to end by Friday, November 22, 2024?

2.    Do you have any personal knowledge of the allegations in this case as I have described them?

3.    Have you read or heard anything about this case through the media, the Internet, or any other source?

4.    Do you have any ideas or prejudices that would make it difficult for you to follow my instructions as to the law?

5.    Do you have any doubt that you will be able to apply the law as I explain it to you, even if you disagree with the law or believe that it should be different?

6.    Do you have any religious or ethical beliefs that would prevent you from passing judgment on another person or entity or finding them liable?

7.    If you are chosen as a juror, do you know of any reason why you could not be fair and impartial?

B.  **Knowledge of People or Places**

8.    The plaintiff in this case is Walid Kamel.  Do you know, or have you had any dealings, directly or indirectly, with Walid Kamel?

9.    The plaintiff will be represented at trial by attorneys Michael Prisco of the Law Office of Michael James Prisco, PLLC?  Do you know Mr. Prisco or his firm?  Have you, or has anyone close to you, ever had any dealings with this lawyer or his firm?

10.    The defendant in this case is the Best Buy Co., Inc., which I will refer to Best Buy.  Have you or anyone close to you ever worked for Best Buy?  Have you ever shopped at the Best Buy at 60 West 23rd Street in Manhattan? Do you or an immediate family member own stock in Best Buy?

11.    The defendant will be represented at trial by the Mitchell Levine of the law firm of Fishman McIntyre Levine Samansky P.C. Do you know Mr. Levine?  Have you, or anyone close to you ever had any dealings with Mr. Levine or his law firm?

12.    The following individuals and entities may be mentioned during the trial, or may be witnesses in this case:

      a.    DHD Medical

      b.    Stand Up MRI of Manhattan

      c.    Lenox Hill Radiology

      d.    Pain Physicians of New York

      e.    McCullogh Orthopedics

      f.    Precision Axelrod

      g.    Dr. Jerry Lubliner

      h.    Dr. Eial (Al) Faierman

      i.    Dr. Jessica Gallina

      j.    Dr. Daimeon Dowden

      k.    Ryan Herder

      l.    Lesley Rodriguez Ponce

      m.    Lariana DeLeon

n.    Metropolitan Hospital

Other than what you have disclosed in response to previous questions, do you know any of these individuals or entities? Have you, or has anyone close to you, had any dealings, directly or indirectly, with any of these individuals or entities?

**C.  Personal Experiences and Opinions**

14.    Have you, or has anyone close to you, ever studied or practiced law, or worked in any capacity in the legal field or court system?

15.    Have you, or anyone close to you, ever been involved in a legal case related to a slip and fall incident, either as a party or a witness?

16.    Do you have any preconceived notions about slip and fall claims that would affect your ability to listen to the evidence in this case with an open mind and to follow my instructions on the law?

17.    Have you ever had a negative experience at a Best Buy?

18.    If you have injured your knees, ankle, hip, or spine, would that affect your ability to base your verdict solely on the evidence presented at trial and to follow my instructions on the law?

19.    Have you ever served as a member of a grand jury?

20.    Have you ever served as a juror in any court?

21.    Have you ever been a party to a lawsuit, criminal or civil?

**D.  Difficulties in Understanding or Serving**

29.    Do you have any problems with your hearing or vision that would prevent you from giving full attention to all of the evidence at this trial?

30.    Are you taking any medication, or do you have any medical condition, that would prevent you from giving full attention to all of the evidence at this trial?

31.    Do you have any difficulty in reading or understanding English?

32.    Is there anything that I have not asked you about that would make you uncomfortable about sitting on this case, or that makes you feel like you cannot be a fair and impartial juror in this case?

<u>Questions for Individual Jurors</u>

1. Please state your name, your county of residence, your borough if you live in one, and your neighborhood.  Have you lived in this county for more than 5 years?

2. How old are you?

3. Do you rent or own your home?

4. How far did you go in school and what schools did you attend, beginning with high school?  (If college, what was your field of study in college?)

5. Are you employed?  If so, who is your employer and what are your general job duties?  (If retired or unemployed, please identify your last employer and general job duties.)

6. How long have you been employed in your current position?  If fewer than five (5) years, where else did you work in the last five (5) years?

7. Who are the members of your household and for whom do they work?

8. If you have grown children, for whom do they work?  If any are college students, what is their field of study?

9. Do you belong to any social, union, professional, political, or religious organizations or clubs?  If so, which ones?

10. Where do you typically get your news (for example, print, television, cable news, radio, websites, social media)?  Which papers, shows, or sites in particular?

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WALID KAMEL,

                      Plaintiff,

             -against-

BEST BUY CO., INC.,

                    Defendant.

Case No. 23-cv-00033 (JLR)

JENNIFER L. ROCHON, United States District Judge:

## PRELIMINARY JURY INSTRUCTIONS

**1. Role of Judge and Jury**

    **A.** Now that you have been sworn, let me give you some instructions about your duties as jurors. In the American system of justice, the judge and the jury have separate roles.

        **i.** My job is to instruct you as to the law that will govern this case, and I will give you most of those instructions at the very end of the trial, although I will give you some, including these, before the end. You **must** take your instructions from the Court — that is, from me —and you are bound by those instructions. You may not substitute your own ideas of what the law is or what you think the law should be.

        **ii.** Your job as jurors will be to determine the facts based on the evidence that comes in during the course of the trial. You are the only deciders of the fact issues, and your determination of the facts will control.

        **iii.** Please do not take anything that I say or do during the course of the trial as indicating that I have a view as to your factual determination. Those decisions are for you.

        **iv.** At the conclusion of the case, your job will be to determine whether the plaintiff has proven its claims against the defendant according to my instructions on the law.

## 2. Order of Trial

**A.** Let me explain how the trial will proceed.

**B.** The first/next step in the trial will be opening statements. First, counsel for the plaintiff will make an opening statement, which is simply an outline to help you understand the evidence as it is presented. Then counsel for the defendant will make an opening statement. I instruct you, however, that opening statements are not evidence.

**C.** After opening statements, the plaintiff will present its evidence. That evidence will consist of the testimony of witnesses as well as documents and exhibits. The plaintiff's lawyers will examine the witnesses and then the defendant's lawyers may cross-examine them. Following the plaintiff's case, the defendant may present a case and may call additional witnesses. The plaintiff's lawyers will have the opportunity to cross-examine any witnesses testifying for the defendant.

**D.** For the efficiency of the trial and convenience of the witnesses, witnesses will generally be called just once whether they are called by the plaintiff or defendant and both parties will conduct their examination of that witness at that time. Do not concern yourself with order of the witnesses; you may consider the relevant testimony of all witnesses, regardless of who may have called them.

**E.** After the presentation of evidence is completed, counsel for the parties will deliver their closing arguments to summarize and interpret the evidence. Just as the lawyers' opening statements are not evidence, their closing arguments are not evidence either.

**F.** Following closing arguments, I will instruct you on the law. Then you will retire to deliberate on your verdict, which must be unanimous, and must be based on the evidence presented at trial.

**G.** It is important to remember that this is a civil case. You may have heard of the "beyond a reasonable doubt" standard in criminal cases. That requirement does <u>not</u> apply to a civil case and you should put it entirely out of your mind. In civil cases, the burden is different and it is called proof by a "preponderance of the evidence." To establish facts by a preponderance of the evidence means to prove that the facts are more likely true than not true. I will, however, instruct you fully on the burden of proof after all of the evidence has been received.

## 3.    What Is and Isn't Evidence

**A.**  What, then, is evidence?  Evidence consists only of the testimony of witnesses, documents and other things admitted as evidence, or any stipulations agreed to by the attorneys.  Some of you probably have heard the terms "circumstantial evidence" and "direct evidence."  Do not be concerned with these terms.  You are to consider all the evidence given in this trial.

**B.**  Certain things are not evidence and must not be considered by you.  The following is a list of what is not evidence:

    **i.**  <u>First</u>, statements and questions by any of the attorneys are not evidence.  Nor are statements I make or questions I ask of a witness.  And, as I said a moment ago, opening and closing statements by the parties are not evidence.

    **ii.**  <u>Second</u>, objections to questions are not evidence.  Counsel for the parties are permitted to raise an objection when they believe that evidence being offered is improper under the rules of evidence.  You should not be influenced by the objections or by my rulings on them.  If an objection is sustained, ignore the question and any answer that may have been given.  If it is overruled, treat the answer like any other.  If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

    **iii.**  <u>Third</u>, testimony that I have excluded or told you to disregard is not evidence and must not be considered.

    **iv.**  <u>Fourth</u>, anything you may have seen or heard outside the courtroom is not evidence and must be disregarded.  You are to decide the case based solely on the evidence presented here in the courtroom.

## 4.    Evaluating the Evidence

**A.**  In deciding the facts of the case, you will have to decide the credibility of the witnesses — that is, how truthful and believable they are.  There is no formula to evaluate evidence.

    **i.**  For now, suffice it to say that you bring with you into this courtroom all of the experience and background of your lives.  Do not leave your common sense outside the courtroom.  The same types of tests that you use in your everyday dealings are the tests that you should apply in deciding how much weight, if any,

to give to the evidence in this case.  You can apply the same tests here in this courtroom that you use in your everyday life when judging whether someone is telling you the truth:

    **a.**  Did they appear to be telling the truth?

    **b.**  Did they have a motive to tell you the truth or to lie?

    **c.**  Did they appear to have a good recollection of the events they're describing?

  **ii.**  Any test that you apply normally in making assessments of reliability and credibility, you can use here. Sometimes, of course, it's not what a witness says but how they say it that can be important to that determination.

**B.**  The law does not require you to accept all of the evidence admitted at trial.  In determining what evidence you accept, you must make your own evaluation of the testimony from each of the witnesses and the exhibits that are received in evidence.

**C.**  It is essential, however, that you keep an open mind until you have heard all of the evidence in the case.  A case can be presented only step by step, witness by witness.

**D.**  As you know from experience, you can hear one person give his or her version of an event and think it sounds very impressive or even compelling, and yet, upon hearing another person's version of the same event — or even the same person cross-examined with respect to the event — things may seem very different.  In other words, there may be another side to any witness's story.

**E.**  You should use your common sense and good judgment to evaluate each witness's testimony based on all of the circumstances.  Again, I cannot emphasize too strongly that you must keep an open mind until the trial is over.  You should not reach any conclusions until you have all the evidence before you.


**5.**   **Rules of Conduct**


  **A.**  Finally, let me caution you about certain rules and principles governing your conduct as jurors in this case.

**i.** <u>First</u>, you must <u>not</u> talk to <u>each other</u> about this case or about anyone who has anything to do with it until the end of the case when you go to the jury room to decide on your verdict. And why do we have that rule? We have that rule because we know it's human nature, if you start discussing something, you start expressing a point of view, and then you start defending the point of view, and then you start agreeing or disagreeing with each other. We don't want you to do that until all the evidence is before you. During deliberations, that's the time to discuss the case. As I have said, keep an open mind until you start your deliberations at the end of the case.

**ii.** <u>Second</u>, do <u>not</u> communicate with <u>anyone else</u> about this case or with anyone who has anything to do with it until the trial has ended and you have been discharged as jurors. Anyone else includes members of your family and your friends. And no communicating about the case means no communicating on Facebook, Twitter, blogs, whatever. You may tell your family and friends that you are a juror in a criminal case, but please do not tell them anything else about it until you have been discharged by me. Do not comment on social media about this case or the fact that you are a juror; do not update your status or any website to reflect that you are a juror.

**iii.** <u>Third</u>, do <u>not</u> let anyone talk to <u>you</u> about the case or about anyone who has anything to do with it. If any person should attempt to communicate with you about this case at any time throughout the trial, either in or out of the courthouse, you must immediately report that to my Deputy and to no one else. When I say report that communication to no one else, I mean that you should not tell anyone, including your fellow jurors.

    **a.** To minimize the probability of any such improper communication, it is important that you go straight to the jury room when you come in in the morning and that you remain in the courtroom or the jury room for the duration of the trial day. You should use the bathrooms in the jury room rather than the bathrooms on this or any other floor; as you were probably told already, you may not use the cafeteria. Given that our morning and afternoon breaks will be short, it is best that you remain in the jury room if you can.

**iv.** <u>Fourth</u>, do <u>not</u> do any research or any investigation on your own about the case or about anyone who has anything to do with the case. During the course of the trial, you will receive all the evidence you may properly consider to decide the case. Because of this, unless and until you are excused as a juror, you should not attempt to gather any information on your own relating to the case.

    **a.** Do <u>not</u> engage in any outside reading on this case.

**b.** Do <u>not</u> attempt to visit any places mentioned in the case.

**c.** Do <u>not</u> use the Internet — Google, Facebook, Twitter, or any other social media site — to learn anything about the case or anyone involved in the case, including the lawyers, witnesses, or me.

**d.** Do <u>not</u> do research of any nature or talk to anyone about the facts of the case or anyone involved in it.

**e.** The reason for these rules, as I am certain you understand, is that your decision in this case must be made solely on the evidence presented at trial, or lack of evidence.

**v.** I expect you to inform me immediately, through my Deputy, if you become aware of another juror's violation of these instructions.

**vi.** This is a public courtroom. People can come and go. It may be that you even know someone who enters this courtroom during this trial. If you do, that's fine. Just let my Deputy know so that I can give you a separate instruction.

**6. Notetaking**

**A.** <u>Finally</u>, each of you will be given a notebook and pen. That is because I permit jurors to take notes. But you do not have to take notes. Notes are just an aid to your own recollection. The court reporters in this case record everything that is said in the courtroom and any portion of the testimony can be read back to you during your deliberations. If you do take notes, be aware that note-taking may distract you from something important that is happening on the witness stand. Also, if you do take notes, please begin writing on the second page of your legal pad, and please put your juror number on the first page of the pad, so that we can be sure that only you will be making and reviewing the notes that are written in your pad.

**B.** I want to emphasize that your notes are not to be shared with fellow jurors during deliberations, that the fact that a juror has taken notes will not entitle him or her to any greater voice in the deliberations, and that a transcript will be available to all jurors if there is any difficulty remembering the testimony. If you do take notes, all notes must be left each day in the jury room. My Deputy will make sure that they are secure.

**7. Final Instructions**

    **A.** From this point until the time when you retire to deliberate, it is your duty not to discuss this case, and not to remain in the presence of other persons who may be discussing this case. In that regard, please remember that the parties and counsel in this case have been instructed to have no contact with any of you. So if you happen to see any of them outside this courtroom, and they do not acknowledge you, say hello, or make small talk, please do not take offense. As I mentioned earlier, they are not being rude — they are simply following my instructions.

    **B.** Now we will begin with the initial stage of the case, which, as I said to you, is opening statements, and we are going to begin with the plaintiff. So at this time I am going to ask all of you to give your undivided attention to the lawyers as they make their opening statements.

Court Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WALID KAMEL,

                                        Plaintiff,

                    -against-                                    Case No. 23-cv-00033 (JLR)

BEST BUY CO., INC.,

                                        Defendant.

JENNIFER L. ROCHON, United States District Judge:

### QUESTIONS FOR JURORS

**Please indicate if your answer to any of the following questions is "yes" by circling the number of that question.  If your answer to a question is "no," you need not do anything.  <u>Do not write your name or make any other marks on the questionnaire.</u>  The only marks you should make are circles around the questions for which the answer is "yes."  If, when asked about a "yes" answer, there is a particularly sensitive issue, please say so and we will speak at the bench.**

### A.  <u>General Questions</u>

1.   Do you have any commitments that would interfere with your serving as a juror on this trial that is expected to end by Thursday, November 21, 2024?

2.   Do you have any personal knowledge of the allegations in this case as I have described them?

3.   Have you read or heard anything about this case through the media, the Internet, or any other source?

4.   Do you have any ideas or prejudices that would make it difficult for you to follow my instructions as to the law?

5.   Do you have any doubt that you will be able to apply the law as I explain it to you, even if you disagree with the law or believe that it should be different?

6.   Do you have any religious or ethical beliefs that would prevent you from passing judgment on another person or entity or finding them liable?

7.   If you are chosen as a juror, do you know of any reason why you could not be fair and impartial?

1

**B.  Knowledge of People or Places**

8.    The plaintiff in this case is Walid Kamel.  Do you know, or have you had any dealings, directly or indirectly, with Walid Kamel?

9.    The plaintiff will be represented at trial by attorneys Michael Prisco of the Law Office of Michael James Prisco, PLLC?  Do you know Mr. Prisco or his firm?  Have you, or has anyone close to you, ever had any dealings with this lawyer or his firm?

10.   The defendant in this case is the Best Buy Co., Inc., which I will refer to Best Buy.  Have you or anyone close to you ever worked for Best Buy?  Have you ever shopped at the Best Buy at 60 West 23rd Street in Manhattan? Do you or an immediate family member own stock in Best Buy?

11.   The defendant will be represented at trial by the Mitchell Levine of the law firm of Fishman McIntyre Levine Samansky P.C. Do you know Mr. Levine?  Have you, or anyone close to you ever had any dealings with Mr. Levine or his law firm?

12.   The following individuals and entities may be mentioned during the trial, or may be witnesses in this case:

    a.   Daimeon Dowden

    b.   Ryan Herder

    c.   Lesley Rodriguez Ponce

    d.   Lariana DeLeon

    e.   Metropolitan Hospital

Other than what you have disclosed in response to previous questions, do you know any of these individuals or entities?  Have you, or has anyone close to you, had any dealings, directly or indirectly, with any of these individuals or entities?

**C.  Personal Experiences and Opinions**

13.   Have you, or has anyone close to you, ever studied or practiced law, or worked in any capacity in the legal field or court system?

14.   Have you, or anyone close to you, ever been involved in a legal case related to a slip and fall incident, either as a party or a witness?

15.   Do you have any preconceived notions about slip and fall claims that would affect your ability to listen to the evidence in this case with an open mind and to follow my instructions on the law?

16.   Have you ever had a negative experience at a Best Buy?

17. Have you ever served as a member of a grand jury?

18. Have you ever served as a juror in any court?

19. Have you ever been a party to a lawsuit, criminal or civil?

**D. Difficulties in Understanding or Serving**

20. Do you have any problems with your hearing or vision that would prevent you from giving full attention to all of the evidence at this trial?

21. Are you taking any medication, or do you have any medical condition, that would prevent you from giving full attention to all of the evidence at this trial?

22. Do you have any difficulty in reading or understanding English?

23. Is there anything that I have not asked you about that would make you uncomfortable about sitting on this case, or that makes you feel like you cannot be a fair and impartial juror in this case?

**Court Exhibit 3**

<u>Questions for Individual Jurors</u>

1.  Please state your name, your county of residence, your borough if you live in one, and your neighborhood.  Have you lived in this county for more than 5 years?

2.  How old are you?

3.  Do you rent or own your home?

4.  How far did you go in school and what schools did you attend, beginning with high school?  (If college, what was your field of study in college?)

5.  Are you employed?  If so, who is your employer and what are your general job duties?  (If retired or unemployed, please identify your last employer and general job duties.)

6.  How long have you been employed in your current position?  If fewer than five (5) years, where else did you work in the last five (5) years?

7.  Who are the members of your household and for whom do they work?

8.  If you have grown children, for whom do they work?  If any are college students, what is their field of study?

9.  Do you belong to any social, union, professional, political, or religious organizations or clubs?  If so, which ones?

10. Where do you typically get your news (for example, print, television, cable news, radio, websites, social media)?  Which papers, shows, or sites in particular?

**Court Exhibit 4**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WALID KAMEL,

                              Plaintiff,

               -against-                          Case No. 23-cv-00033 (JLR)

BEST BUY CO., INC.,

                              Defendant.

JENNIFER L. ROCHON, United States District Judge:

# **<u>JURY INSTRUCTIONS</u>**

# TABLE OF CONTENTS

I.     GENERAL INSTRUCTIONS ................................................................ 3

    A.     Introductory Remarks ......................................................... 3

    B.     Role of the Court.................................................................. 3

    C.     Role of the Jury.................................................................... 4

    D.     Role of Counsel.................................................................... 4

    E.     Sympathy or Bias ................................................................ 5

    F.     Burden of Proof................................................................... 6

    G.     What Is and Is Not Evidence ............................................... 7

    H.     Direct and Circumstantial Evidence ................................... 8

    I.     Witness Credibility ............................................................. 9

    J.     Prior Inconsistent Statement ............................................ 11

    K.     Use of Deposition Testimony ........................................... 11

    L.     Preparation of Witnesses  [if applicable] ......................... 12

II.    SUBSTANTIVE INSTRUCTIONS ................................................... 12

    A.     Negligence ........................................................................ 12

        1.     **First Element** ...................................................... 13

        2.     **Second Element** ................................................. 13

        3.     **Third Element** ................................................... 14

III.   DELIBERATIONS OF THE JURY ................................................... 15

    A.     Selection and Duties of Foreperson .................................. 15

    B.     Right to See Exhibits and Hear Testimony; Communication with the Court ................................................................................................ 16

    C.     Notes ................................................................................. 16

    D.     Duty to Deliberate............................................................. 17

    E.     Verdict Form ..................................................................... 18

    F.     Return of Verdict .............................................................. 18

IV.   CONCLUSION.................................................................................. 19

# I.    GENERAL INSTRUCTIONS

## A.    Introductory Remarks

Members of the jury, I will now instruct you as to the law that governs this case.  You have been handed a copy of the instructions I will read.  You should feel free to read along or to just listen to me.  You will be able to take your copy of these instructions into the jury room.

Listening to these instructions may not be easy because they are long and extensive.  It is important, however, that you listen carefully and concentrate.  You'll notice that I'm reading these instructions from a prepared text.  It would be more lively, no doubt, if I just improvised.  But it's important that I not do that.  The law is made up of words, and those words are very carefully chosen.  So, when I tell you the law, it's critical that I use exactly the right words.

You have now heard all of the evidence in the case as well as the final arguments of the parties.  You have paid careful attention to the evidence, and I am confident that you will act together with fairness and impartiality to reach a just verdict in the case.

There are three parts to these instructions.  First, I'm going to give you some general instructions about your role, and about how you are to decide the facts of the case.  Most of these instructions would apply to just about any trial.  Second, I'll give you some specific instructions about the legal rules applicable to this particular case.  Third, I'll give you some final instructions about procedures and deliberations.

## B.    Role of the Court

My duty at this point is to instruct you as to the law.  It is your duty to accept these instructions of law and to apply them to the facts as you determine them.  With respect to legal matters, you must take the law as I give it to you.  If any attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

You must not substitute your own notions or opinions of what the law is or what you think it ought to be. You are to consider these instructions together as a whole; in other words, you are not to isolate or give undue weight to any particular instruction.

### C.    Role of the Jury

As members of the jury, you are the sole and exclusive judges of the facts. You evaluate the evidence. You determine the credibility of the witnesses. You resolve such conflicts as there may be in the testimony. You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

Do not conclude from any of my rulings on objections or anything else I have done during this trial that I have any view as to the credibility of the witnesses or how you should decide the case. Any opinion I might have regarding the facts is of absolutely no consequence.

It is your sworn duty, and you have taken the oath as jurors, to determine the facts and to render judgment impartially and fairly, solely on the evidence in this case and the applicable law.

### D.    Role of Counsel

It is the duty of the attorneys to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible. It is my job to rule on those objections. Therefore, why an objection was made or why I ruled on it the way I did is not your concern. You should draw no inference from the fact that an attorney objects to any evidence. Nor should you draw any inference from the fact that I might have sustained or overruled an objection. If I sustained the objection, you may not consider the testimony or exhibit at issue; if I overruled the objection, you may consider the testimony or exhibit just as you would any other evidence in the case.

The personalities and the conduct of counsel in the courtroom are not in any way at issue. If you formed opinions or had reactions of any kind to the lawyers here, favorable or unfavorable, whether you approved or disapproved of their behavior as advocates, those opinions or reactions should not enter into your deliberations.

During the course of the trial, I may have had to correct the presentation of an attorney, for example, to ask them to rephrase a question. You should draw no inference against the attorney or the client. It is the duty of the attorneys to advocate on behalf of their clients.

From time to time, the lawyers and I have had conferences out of your hearing. These conferences involved procedural and other legal matters, and should not enter into your deliberations at all.

### E.    Sympathy or Bias

You must evaluate the evidence calmly and objectively, without prejudice or sympathy. You must be completely fair and impartial. Your verdict must be based solely on the evidence presented at this trial, or the lack of evidence.

You may not consider, in deciding the facts of the case, any personal feelings you may have about the race, religion, national origin, gender, age, sexual orientation, disability, or physical appearance of any party or witness. It is equally improper for you to allow any personal feeling that you might have about the nature of the claims or defenses to influence you in any way. The parties in this case are entitled to a trial free from prejudice and bias. Our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

The case should be decided by you as an action between parties of equal standing in the community, even though one of them is a corporation. All parties are entitled to the same fair trial by you.

### F.    Burden of Proof

At various times in these instructions I will use the term "burden of proof" in order to inform you which party has the burden of proof on a particular claim or a particular issue.  As this is a civil case, the standard of proof is a preponderance of the evidence.

The party who has the burden of proof on a particular issue has the burden of establishing their position on that issue by a preponderance of the evidence. If you conclude that the party who has the burden of proof on an issue has failed to establish their position by a preponderance of the evidence, you must decide against that party on that issue.

What does a "preponderance of the evidence" mean?  To establish something by a preponderance of evidence means to prove something is more likely so than not so.  A preponderance of the evidence means the greater weight of the evidence.  It refers to the quality and persuasiveness of the evidence, not to the number of witnesses or documents.  In determining whether a claim has been proved by a preponderance of the evidence, you may consider the relevant testimony of all witnesses, regardless of who may have called them, and all the relevant exhibits received in evidence, regardless of who may have produced or admitted them.

If you find that the credible evidence on a given issue is evenly divided between the parties, then you must decide that issue against the party having this burden of proof.  That is because the party bearing this burden must prove more than simple equality of evidence – the party must prove the element at issue by a preponderance of the evidence.  On the other hand, the party with this burden of proof need prove no more than a preponderance of the evidence.  So long as you find that the scales tip, however slightly, in favor of the party with this burden of proof then that element will have been proved by a preponderance of the evidence.

One final note on the burden of proof: some of you may have heard of "proof beyond a reasonable doubt."  As I told you at the beginning of the trial, "beyond a reasonable doubt" is the standard of proof in a criminal trial.  It does not apply to a civil case such as this and you should put it out of your mind.

### G.    What Is and Is Not Evidence

In determining the facts, you must rely upon your own recollection of the evidence.  The evidence in this case is the sworn testimony of the witnesses and the exhibits received in evidence.

The only exhibits that are evidence in this case are those that were received in evidence. Exhibits marked for identification but not admitted are not evidence, nor are materials that were used only to refresh a witness's recollection.

Some exhibits may have redactions on them, or places where the text has been blocked out. You should not concern yourself with what was redacted, nor why anything was redacted from a document.

As I told you at the start of this case, statements and arguments by the lawyers are not evidence, because the lawyers are not witnesses.  What they have said to you in their opening statements and in their summations is intended to help you understand the evidence to reach your verdict.  If your recollection of the facts differs from the lawyers' statements, however, it is your recollection that controls.

For the same reasons, you are not to consider a lawyer's questions, restatements of exhibits, or summarizing of the witness's testimony as evidence.  It is the witnesses' answers to those questions, evaluated in the context of the question asked, or the exhibits themselves that are evidence.  Similarly, any statements that I may have made do not constitute evidence.  It is for you

alone to decide the weight, if any, to be given to the testimony you have heard and the exhibits you have seen.

Finally, this means, of course, that anything you may have heard or read outside of this courtroom – on the internet, in the news media, or anywhere else – may play no role in your deliberations.  Your decision in this case must be made solely on the evidence presented at trial.

### H.    Direct and Circumstantial Evidence

Generally, there are two types of evidence that you may consider in reaching your verdict.  One type of evidence is direct evidence.  Direct evidence is testimony by a witness about something he or she knows by virtue of his or her own senses – something the witness has seen, felt, touched, or heard.  For example, if a witness testified that when he or she left the house this morning, it was raining, that would be direct evidence about the weather.  Direct evidence may also be in the form of an exhibit.

Circumstantial evidence is evidence from which you may infer the existence of certain facts.  For example, assume that when you came into the courthouse this morning the sun was shining and it was a nice day.  Assume that the courtroom blinds were drawn and you could not look outside.  As you were sitting here, someone walked in with an umbrella, which was dripping wet.  Then a few minutes later another person entered with a wet raincoat.  Now, you cannot look outside of the courtroom and you cannot see whether or not it is raining.  So, you have no direct evidence of that fact.  But on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it had been raining.

That is all there is to circumstantial evidence.  You infer on the basis of reason, experience, and common sense from one established fact the existence or non-existence of some other fact.  As you can see, the matter of drawing inferences from facts in evidence is not a matter of

guesswork or speculation.  An inference is a logical, factual conclusion that you might reasonably draw from other facts that have been proven.  Many material facts – such as what a person was thinking or intending – are not easily proven by direct evidence.  Proof of such matters may be established by circumstantial evidence.

Circumstantial evidence is as valuable as direct evidence.  The law makes no distinction between direct and circumstantial evidence.

There are times when different inferences may be drawn from the evidence.  The plaintiff asks you to draw one set of inferences.  The defendants ask you to draw another.  It is for you, and for you alone, to decide what inferences you will draw.

**I.    Witness Credibility**

You have had the opportunity to observe the witnesses.  It is now your job to decide how believable each witness was in his or her testimony.  You are the sole judges of the credibility of each witness and of the importance of his or her testimony.

You should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, the impression the witness made when testifying, the relationship of the witness to the controversy and the parties, the witness's bias or impartiality, the reasonableness of the witness's statement, the strength or weakness of the witness's recollection viewed in the light of all other testimony, and any other matter in evidence that may help you decide the truth and the importance of each witness's testimony.

In other words, what you must try to do in deciding credibility is to size a witness up in light of his or her demeanor, the explanations given and all of the other evidence in the case.  How did the witness appear?  Was the witness candid, frank, and forthright; or, did the witness seem to be evasive or suspect in some way?  How did the way the witness testified on direct examination

compare with how the witness testified on cross-examination? Was the witness consistent or contradictory? Did the witness appear to know what he or she was talking about? Did the witness strike you as someone who was trying to report his or her knowledge accurately? These are examples of the kinds of common-sense questions you should ask yourselves in deciding whether a witness is, or is not, truthful. Often it is not what a person says but how he or she says it that moves us.

In passing upon the credibility of a witness, you may take into account any inconsistencies or contradictions as to material matters in his or her testimony. You should also take into account any evidence that the witness who testified may benefit in some way from the outcome in this case. Likewise, you should note any evidence of hostility or affection that the witness may have towards one of the parties. Such bias or interest in the outcome creates a motive to testify falsely. It is your duty to consider whether the witness has permitted any such bias or interest to color his or her testimony and bear that factor in mind when evaluating the credibility of the testimony.

This is not to suggest that every witness who has an interest in the outcome of a case will testify falsely. It is for you to decide to what extent, if at all, the witness's interest has affected or colored his or her testimony.

If you find that any witness has willfully testified falsely as to any material fact, you have the right to reject the testimony of that witness in its entirety. On the other hand, even if you find that a witness has testified falsely about one matter, you may reject as false that portion of his or her testimony and accept as true any other portion of the testimony which you find credible or which you may find corroborated by other evidence in this case. A witness may be inaccurate, contradictory, or even untruthful in some aspects, and yet be truthful and entirely credible in other aspects of his or her testimony.

The ultimate question for you to decide in passing upon credibility is: did the witness tell the truth before you?  It is for you to say whether his or her testimony at this trial was truthful in whole or in part.

### J.    Prior Inconsistent Statement

You may have heard evidence that certain witnesses may have made statements on earlier occasions which counsel argue are inconsistent with their trial testimony.  If you find that a witness made an earlier statement that conflicts with that witness's trial testimony, you may consider that fact in deciding how much of the trial testimony, if any, to believe.

In making this determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an important fact, or whether it had to do with a small detail; whether the witness had an explanation for the inconsistency; and whether that explanation appealed to your common sense.

It is exclusively your duty, based upon all the evidence and your own good judgment, to determine whether the prior statement was inconsistent, and if so, how much, if any, weight to be given to the inconsistent statement in determining whether to believe all or part of the witness' testimony.

### K.    Use of Deposition Testimony

Some of the testimony before you is in the form of depositions which have been received in evidence.  A deposition is simply a procedure where the attorneys for one side may question a witness or an adversary party under oath before a court stenographer prior to trial.  This is part of the pretrial discovery, and each side is entitled to take depositions.  You may consider the testimony of a witness given at a deposition according to the same standards you would use to evaluate the testimony of a witness given at this trial.

### L.    Preparation of Witnesses  [if applicable]

You have heard evidence that certain witnesses may have prepared with their lawyers for appearing in court today.  Although you may consider that fact when you are evaluating a witness's credibility, I am instructing you that there is nothing unusual or improper about a witness meeting with lawyers before testifying.  Indeed, it would be unusual for a lawyer to call a witness to testify without such preparation.

## II.    SUBSTANTIVE INSTRUCTIONS

I will turn now to my instructions on the substantive law to be applied to this case.  As you have heard, plaintiff Walid Kamel brings this action against defendant Best Buy, claiming that he was injured when he slipped and fell on a sign that was on the floor when he was walking through a Best Buy store located at 60 West 23rd Street in Manhattan on October 18, 2021.  Plaintiff claims Best Buy negligently maintained its retail store.  Best Buy has a duty to use reasonable care to keep its store in a reasonably safe condition for the protection of all persons whose presence is reasonably foreseeable.

Defendant denies that the accident occurred and denies that a sign was left on the floor. Defendant also disputes that plaintiff was injured as a result of an accident in the Best Buy store.

The plaintiff has asserted a claim for negligence.  You should consider each element of the claim separately and determine whether the plaintiff has proven the elements of his claim by a preponderance of the evidence.

### A.    Negligence

To recover, Plaintiff must prove: (1) the Best Buy store was not reasonably safe; (2) that Best Buy was negligent in not keeping the store in a reasonably safe condition; and (3) that Best Buy's negligence in allowing the unsafe condition to exist was a substantial factor in causing

Plaintiff's injuries.  The burden of proof rests on Plaintiff to prove all of these elements by a preponderance of the evidence.

### 1.    First Element

First, you must consider whether Best Buy's store was reasonably safe.  Plaintiff claims Best Buy's store was not reasonably safe because Best Buy's employees left signage/advertisement on the floor in an aisle, which presented a slipping hazard.  Best Buy claims that no such signs were on the floor.  If you decide that Best Buy's store was reasonably safe, you will find in favor of Best Buy and your deliberations are over.  If you decide that Best Buy's store was not reasonably safe, you will proceed to consider the second element of whether Best Buy was negligent in creating the unsafe condition.

### 2.    Second Element

Negligence is the failure to use reasonable care.  Reasonable care means that degree of care that a reasonably prudent corporate retail store would use under the same circumstances, taking into account the foreseeable risk of injury.  In deciding whether Best Buy was negligent, you must decide whether Best Buy's employees created the dangerous condition by leaving signage on the floor as plaintiff claims, or either knew or, in the use of reasonable care, should have known, that the signage was left on the floor as plaintiff claims.  If Best Buy did not create the condition by its employees leaving the sign on the floor as plaintiff claims but knew or should have known that signage was laying on the floor as plaintiff claims, you must decide whether Best Buy had sufficient time before the accident to correct the claimed condition, provide reasonable safeguards, or provide reasonable warning.

To find Best Buy negligent, you must find that Plaintiff's presence at the store was foreseeable and that (1) Best Buy created the dangerous condition by its employees leaving the

signage on the floor as plaintiff claims or (2) Best Buy either knew of the claimed unsafe condition long enough before Plaintiff's injury to have permitted Best Buy in the use of reasonable care to have it corrected or to take other suitable precautions and did not do so; or if Best Buy did not know of the claimed condition but in the use of reasonable care should have known of it and corrected it (or taken other suitable precautions).

You will find that Best Buy was negligent if you decide that Plaintiff's presence in the store was foreseeable and that Best Buy created the dangerous condition by leaving the signage on the floor as Plaintiff claims, or in the use of reasonable care should have known, about the signage left on the floor, if any, long enough before Plaintiff's injuries to have allowed Best Buy, in the use of reasonable care to correct it or to take other suitable precautions and Best Buy failed to do so. You will then move on to the third element. On the other hand, if you find that Plaintiff's presence was not foreseeable or that Best Buy did not create the condition by leaving signage on the floor and, further, that Best Buy did not know about or, in the use of reasonable care, would not have been able to discover and remove the signs from the floor or take other suitable precautions before Plaintiff's injuries, then you will find that Best Buy was not negligent and your deliberations are over.

### 3.    Third Element

If you find that Best Buy was negligent you must next consider whether that negligence was a substantial factor in causing Plaintiff's injuries. An act or failure to act is a substantial factor in bringing about an injury if a reasonable person would regard it a cause of the injury. If you find that Best Buy's negligence was not a substantial factor in causing the injury, then Plaintiff may not recover on his claim. If you find that Best Buy's negligence was a substantial factor in causing Plaintiff's injury, you will proceed to consider whether Plaintiff was also negligent.

If you find that Best Buy was negligent and that Best Buy's negligence was a substantial factor in causing Plaintiff's injury, you must next consider whether plaintiff was also negligent and whether Plaintiff's conduct was also a substantial factor in causing the accident. With respect to whether Plaintiff's conduct was a substantial factor in causing the accident, here Best Buy has the burden of proof. Best Buy must prove by a preponderance of the evidence that Plaintiff was negligent and that Plaintiff's negligence was also a substantial factor in causing the accident. If you find that Plaintiff was not negligent, or if negligent, that his negligence was not a substantial factor in causing the accident, you must find that Plaintiff was not at fault and proceed further. If, however, you find that Plaintiff was negligent and that his negligence was also a substantial factor in causing the accident you must then apportion the fault between Plaintiff and Best Buy.

Weighing all the facts and circumstances, you must consider the total fault, that is, the fault of both Plaintiff and Best Buy and decide what percentage of fault is chargeable to each. You will state the percentages that you find in your verdict sheet. The total of those percentages must equal 100%.

## III.    DELIBERATIONS OF THE JURY

Ladies and gentlemen of the jury, that concludes the substantive portion of my instructions to you. You are about to go into the jury room and begin your deliberations. I will now give you a few final instructions on those deliberations.

### A.    Selection and Duties of Foreperson

It is customary for Juror Number 1 to serve as the foreperson, and that is what we will do here. The foreperson doesn't have any more power or authority than any other juror, and his or her vote or opinion doesn't count for any more than any other juror's vote or opinion. The foreperson is merely your spokesperson to the court. The foreperson will send out any notes, and

when the jury has reached a verdict, the foreperson will notify the marshal that the jury has reached a verdict, and you will come into open court and give the verdict.

**B.    Right to See Exhibits and Hear Testimony; Communication with the Court**

All of the exhibits admitted into evidence will be sent to the jury room with you.  If you want any of the testimony read, you may request that.  Please remember that it is not always easy to locate what you might want, so be as specific as you possibly can be in requesting portions of the testimony.

Your requests for testimony—in fact <u>any</u> communications with the Court—should be made to me in writing, signed, dated, and timed by your foreperson, and given to one of the marshals. Please make any notes as clear and precise as possible.  Do not tell me or anyone else how the jury stands on any issue until after a verdict is reached and announced in open court by your foreperson.

**C.    Notes**

Some of you have taken notes periodically throughout this trial.  I want to emphasize to you, as you are about to begin your deliberations, that notes are solely to assist you as an aid to your memory.  Do not share your notes with other jurors during deliberations.  Notes that any of you may have made may not be given any greater weight or influence than the recollections or impressions of other jurors, whether from notes or memory, with respect to the evidence presented or what conclusions, if any, should be drawn from such evidence.  All jurors' recollections are equal.  If you can't agree on what you remember the testimony was, you can ask to have the transcript read back.

### D.    Duty to Deliberate

Shortly, you will retire to decide the case.  You are not to discuss the case unless and until all jurors are present.  A majority of jurors together are only a gathering of individuals. Only when all jurors are present do you constitute the jury, and only then may you deliberate.

You must base your verdict solely on the evidence and these instructions as to the law, and you are obliged on your oath as jurors to follow the law as I instruct you, whether you agree or disagree with the particular law in question.

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement.  Each of you must decide the case for himself or herself, but you should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous.  Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

Again, you must try to come to consensus but you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors.  Each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors.  No juror should surrender his or her conscientious beliefs solely for the purpose of returning a verdict.

Remember at all times, you are not partisans.  You are judges—judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.  Nothing said in these instructions and nothing in any verdict form prepared for your convenience is meant to suggest or convey in

any way or manner any suggestion or hint as to what verdict I think you should find. What the verdict shall be is your sole and exclusive duty and responsibility.

If you cannot reach a verdict, do *not* report how the vote stands and if you have reached a verdict do not report what it is until you are asked in open court.

### E.    Verdict Form

In a few moments, I will give you the verdict form with the questions for you to answer and you will retire to deliberate your decision. The questions are not to be taken as any indication that I have any opinion as to how they should be answered. I have no such opinion, and even if I did, it would not be binding on you.

When you review the verdict form, you will see that each of the questions calls for a "Yes" or "No" answer, some numerical figure, or some percentage. You should answer every question except where the verdict form indicates otherwise. You should also proceed through the questions in the order in which they are listed and follow all instructions. Remember, all answers must be unanimous.

### F.    Return of Verdict

After you have reached a verdict, your foreperson will fill in the verdict form that has been given to you, sign it, and advise the marshal outside your door that you are ready to return to the courtroom.

I will stress that each of you must be in agreement with the verdict sheet which is announced in court. Once your verdict is announced and officially recorded, it cannot ordinarily be revoked.

## IV.    CONCLUSION

In conclusion, gentlemen, I am sure that if you listen to the views of your fellow jurors, consider all of the evidence, apply your own common sense, and follow my instructions on the law, you will reach a fair verdict here.  Thank you for your time and attentiveness.

**Court Exhibit 5**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WALID KAMEL,

                          Plaintiff,

          -against-                              Case No. 23-cv-00033 (JLR)

BEST BUY CO., INC.,

                          Defendant.

JENNIFER L. ROCHON, United States District Judge:


**<u>SPECIAL VERDICT FORM</u>**

Court Exhibit 5

**Please answer each question in order and follow the instructions before moving to the next question. All answers must be unanimous.**

## QUESTION 1

Was defendant Best Buy negligent?

CHECK ONE: YES_____        NO_____

*If your answer is YES, proceed to Question 2.*

*If your answer is NO, <u>do not answer any additional questions</u>, and proceed to the last page of the verdict form and the foreperson should sign the verdict form and alert the Marshal.*

## QUESTION 2

Was the negligence of defendant Best Buy a substantial factor in causing the plaintiff's accident?

CHECK ONE: YES_____ NO_____

*If your answer is YES, proceed to Question 3.*

*If your answer is NO, <u>do not answer any additional questions</u>, and proceed to the last page of the verdict form and the foreperson should sign the verdict form and alert the Marshal.*

## QUESTION 3

Was plaintiff Walid Kamel negligent?

CHECK ONE: YES_____ NO_____

*If your answer is YES, proceed to Question 4.*

*If your answer is NO, <u>do not answer any additional questions</u>, and proceed to the last page of the verdict form and the foreperson should sign the verdict form and alert the Marshal.*

**Court Exhibit 5**

## QUESTION 4

Was the negligence of plaintiff Walid Kamel a substantial factor in causing the accident?

CHECK ONE: YES_____   NO_____

*If your answer is YES, proceed to Question 5.*

*If your answer is NO, <u>do not answer any additional questions</u>, and proceed to the last page of the verdict form and the foreperson should sign the verdict form and alert the Marshal.*

## QUESTION 5

What was the percentage of fault of the defendant and what was the percentage of fault of the plaintiff?

DEFENDANT:        _____%

PLAINTIFF:        _____%

**Total must be 100%.**

*Please proceed to the last page of the verdict form.*

**You have completed all questions.  Please proceed to the signature line below.**

**SIGNATURE LINE**

If this verdict form reflects the unanimous verdict of all jurors, the foreperson shall sign and date the verdict sheet.  Then, without disclosing your verdict, advise the Marshal, that you have reached a verdict and are ready to return to the courtroom to announce your verdict.

_____
Foreperson

Dated:    _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WALID KAMEL, | |
| Plaintiff, | |
| -against- | Case No. 23-cv-00033 (JLR) |
| BEST BUY CO., INC., | |
| Defendant. | |

JENNIFER L. ROCHON, United States District Judge:

# <u>JURY INSTRUCTIONS</u>

# TABLE OF CONTENTS

I.  GENERAL INSTRUCTIONS ............................................................................ 3

    A.  Introductory Remarks ...................................................................... 3

    B.  Role of the Court.............................................................................. 3

    C.  Role of the Jury ................................................................................ 4

    D.  Role of Counsel................................................................................ 4

    E.  Sympathy or Bias ............................................................................ 5

    F.  Burden of Proof............................................................................... 6

    G.  What Is and Is Not Evidence .......................................................... 7

    H.  Direct and Circumstantial Evidence ............................................... 8

    I.  Witness Credibility ......................................................................... 9

    J.  Prior Inconsistent Statement ......................................................... 11

    K.  Use of Deposition Testimony ....................................................... 11

II.  SUBSTANTIVE INSTRUCTIONS ........................................................... 12

    A.  Negligence .................................................................................... 12

        1.  **First Element** ................................................................... 13

        2.  **Second Element** .............................................................. 13

        3.  **Third Element** ................................................................. 14

III.  DELIBERATIONS OF THE JURY ........................................................... 15

    A.  Selection and Duties of Foreperson .............................................. 15

    B.  Right to See Exhibits and Hear Testimony; Communication with the Court .................................................................................................... 16

    C.  Notes ............................................................................................. 16

    D.  Duty to Deliberate........................................................................ 16

    E.  Verdict Form ................................................................................. 18

    F.  Return of Verdict .......................................................................... 18

IV.  CONCLUSION ......................................................................................... 18

## I.     GENERAL INSTRUCTIONS

### A.     Introductory Remarks

Members of the jury, I will now instruct you as to the law that governs this case.  You have been handed a copy of the instructions I will read.  You should feel free to read along or to just listen to me.  You will be able to take your copy of these instructions into the jury room.

Listening to these instructions may not be easy because they are long and extensive.  It is important, however, that you listen carefully and concentrate.  You'll notice that I'm reading these instructions from a prepared text.  It would be more lively, no doubt, if I just improvised.  But it's important that I not do that.  The law is made up of words, and those words are very carefully chosen.  So, when I tell you the law, it's critical that I use exactly the right words.

You have now heard all of the evidence in the case as well as the final arguments of the parties.  You have paid careful attention to the evidence, and I am confident that you will act together with fairness and impartiality to reach a just verdict in the case.

There are three parts to these instructions.  First, I'm going to give you some general instructions about your role, and about how you are to decide the facts of the case.  Most of these instructions would apply to just about any trial.  Second, I'll give you some specific instructions about the legal rules applicable to this particular case.  Third, I'll give you some final instructions about procedures and deliberations.

### B.     Role of the Court

My duty at this point is to instruct you as to the law.  It is your duty to accept these instructions of law and to apply them to the facts as you determine them.  With respect to legal matters, you must take the law as I give it to you.  If any attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

You must not substitute your own notions or opinions of what the law is or what you think it ought to be. You are to consider these instructions together as a whole; in other words, you are not to isolate or give undue weight to any particular instruction.

### C.    Role of the Jury

As members of the jury, you are the sole and exclusive judges of the facts. You evaluate the evidence. You determine the credibility of the witnesses. You resolve such conflicts as there may be in the testimony. You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

Do not conclude from any of my rulings on objections or anything else I have done during this trial that I have any view as to the credibility of the witnesses or how you should decide the case. Any opinion I might have regarding the facts is of absolutely no consequence.

It is your sworn duty, and you have taken the oath as jurors, to determine the facts and to render judgment impartially and fairly, solely on the evidence in this case and the applicable law.

### D.    Role of Counsel

It is the duty of the attorneys to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible. It is my job to rule on those objections. Therefore, why an objection was made or why I ruled on it the way I did is not your concern. You should draw no inference from the fact that an attorney objects to any evidence. Nor should you draw any inference from the fact that I might have sustained or overruled an objection. If I sustained the objection, you may not consider the testimony or exhibit at issue; if I overruled the objection, you may consider the testimony or exhibit just as you would any other evidence in the case.

The personalities and the conduct of counsel in the courtroom are not in any way at issue. If you formed opinions or had reactions of any kind to the lawyers here, favorable or unfavorable, whether you approved or disapproved of their behavior as advocates, those opinions or reactions should not enter into your deliberations.

During the course of the trial, I may have had to correct the presentation of an attorney, for example, to ask them to rephrase a question. You should draw no inference against the attorney or the client. It is the duty of the attorneys to advocate on behalf of their clients.

From time to time, the lawyers and I have had conferences out of your hearing. These conferences involved procedural and other legal matters, and should not enter into your deliberations at all.

### E.    Sympathy or Bias

You must evaluate the evidence calmly and objectively, without prejudice or sympathy. You must be completely fair and impartial. Your verdict must be based solely on the evidence presented at this trial, or the lack of evidence.

You may not consider, in deciding the facts of the case, any personal feelings you may have about the race, religion, national origin, gender, age, sexual orientation, disability, or physical appearance of any party or witness. It is equally improper for you to allow any personal feeling that you might have about the nature of the claims or defenses to influence you in any way. The parties in this case are entitled to a trial free from prejudice and bias. Our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

The case should be decided by you as an action between parties of equal standing in the community, even though one of them is a corporation. All parties are entitled to the same fair trial by you.

### F.    Burden of Proof

At various times in these instructions I will use the term "burden of proof" in order to inform you which party has the burden of proof on a particular claim or a particular issue.  As this is a civil case, the standard of proof is a preponderance of the evidence.

The party who has the burden of proof on a particular issue has the burden of establishing their position on that issue by a preponderance of the evidence. If you conclude that the party who has the burden of proof on an issue has failed to establish their position by a preponderance of the evidence, you must decide against that party on that issue.

What does a "preponderance of the evidence" mean?  To establish something by a preponderance of evidence means to prove something is more likely so than not so.  A preponderance of the evidence means the greater weight of the evidence.  It refers to the quality and persuasiveness of the evidence, not to the number of witnesses or documents.  In determining whether a claim has been proved by a preponderance of the evidence, you may consider the relevant testimony of all witnesses, regardless of who may have called them, and all the relevant exhibits received in evidence, regardless of who may have produced or admitted them.

If you find that the credible evidence on a given issue is evenly divided between the parties, then you must decide that issue against the party having this burden of proof.  That is because the party bearing this burden must prove more than simple equality of evidence – the party must prove the element at issue by a preponderance of the evidence.  On the other hand, the party with this burden of proof need prove no more than a preponderance of the evidence.  So long as you find that the scales tip, however slightly, in favor of the party with this burden of proof then that element will have been proved by a preponderance of the evidence.

One final note on the burden of proof: some of you may have heard of "proof beyond a reasonable doubt." As I told you at the beginning of the trial, "beyond a reasonable doubt" is the standard of proof in a criminal trial. It does not apply to a civil case such as this and you should put it out of your mind.

### G.    What Is and Is Not Evidence

In determining the facts, you must rely upon your own recollection of the evidence. The evidence in this case is the sworn testimony of the witnesses and the exhibits received in evidence.

The only exhibits that are evidence in this case are those that were received in evidence. Exhibits marked for identification but not admitted are not evidence, nor are materials that were used only to refresh a witness's recollection.

Some exhibits may have redactions on them, or places where the text has been blocked out. You should not concern yourself with what was redacted, nor why anything was redacted from a document.

As I told you at the start of this case, statements and arguments by the lawyers are not evidence, because the lawyers are not witnesses. What they have said to you in their opening statements and in their summations is intended to help you understand the evidence to reach your verdict. If your recollection of the facts differs from the lawyers' statements, however, it is your recollection that controls.

For the same reasons, you are not to consider a lawyer's questions, restatements of exhibits, or summarizing of the witness's testimony as evidence. It is the witnesses' answers to those questions, evaluated in the context of the question asked, or the exhibits themselves that are evidence. Similarly, any statements that I may have made do not constitute evidence. It is for you

alone to decide the weight, if any, to be given to the testimony you have heard and the exhibits you have seen.

Finally, this means, of course, that anything you may have heard or read outside of this courtroom – on the internet, in the news media, or anywhere else – may play no role in your deliberations.  Your decision in this case must be made solely on the evidence presented at trial.

### H.    Direct and Circumstantial Evidence

Generally, there are two types of evidence that you may consider in reaching your verdict.  One type of evidence is direct evidence.  Direct evidence is testimony by a witness about something he or she knows by virtue of his or her own senses – something the witness has seen, felt, touched, or heard.  For example, if a witness testified that when he or she left the house this morning, it was raining, that would be direct evidence about the weather.  Direct evidence may also be in the form of an exhibit.

Circumstantial evidence is evidence from which you may infer the existence of certain facts.  For example, assume that when you came into the courthouse this morning the sun was shining and it was a nice day.  Assume that the courtroom blinds were drawn and you could not look outside.  As you were sitting here, someone walked in with an umbrella, which was dripping wet.  Then a few minutes later another person entered with a wet raincoat.  Now, you cannot look outside of the courtroom and you cannot see whether or not it is raining.  So, you have no direct evidence of that fact.  But on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it had been raining.

That is all there is to circumstantial evidence.  You infer on the basis of reason, experience, and common sense from one established fact the existence or non-existence of some other fact.  As you can see, the matter of drawing inferences from facts in evidence is not a matter of

guesswork or speculation.  An inference is a logical, factual conclusion that you might reasonably draw from other facts that have been proven.  Many material facts – such as what a person was thinking or intending – are not easily proven by direct evidence.  Proof of such matters may be established by circumstantial evidence.

Circumstantial evidence is as valuable as direct evidence.  The law makes no distinction between direct and circumstantial evidence.

There are times when different inferences may be drawn from the evidence.  The plaintiff asks you to draw one set of inferences.  The defendants ask you to draw another.  It is for you, and for you alone, to decide what inferences you will draw.

### I.    Witness Credibility

You have had the opportunity to observe the witnesses.  It is now your job to decide how believable each witness was in his or her testimony.  You are the sole judges of the credibility of each witness and of the importance of his or her testimony.

You should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, the impression the witness made when testifying, the relationship of the witness to the controversy and the parties, the witness's bias or impartiality, the reasonableness of the witness's statement, the strength or weakness of the witness's recollection viewed in the light of all other testimony, and any other matter in evidence that may help you decide the truth and the importance of each witness's testimony.

In other words, what you must try to do in deciding credibility is to size a witness up in light of his or her demeanor, the explanations given and all of the other evidence in the case.  How did the witness appear?  Was the witness candid, frank, and forthright; or, did the witness seem to be evasive or suspect in some way?  How did the way the witness testified on direct examination

compare with how the witness testified on cross-examination? Was the witness consistent or contradictory? Did the witness appear to know what he or she was talking about? Did the witness strike you as someone who was trying to report his or her knowledge accurately? These are examples of the kinds of common-sense questions you should ask yourselves in deciding whether a witness is, or is not, truthful. Often it is not what a person says but how he or she says it that moves us.

In passing upon the credibility of a witness, you may take into account any inconsistencies or contradictions as to material matters in his or her testimony. You should also take into account any evidence that the witness who testified may benefit in some way from the outcome in this case. Likewise, you should note any evidence of hostility or affection that the witness may have towards one of the parties. Such bias or interest in the outcome creates a motive to testify falsely. It is your duty to consider whether the witness has permitted any such bias or interest to color his or her testimony and bear that factor in mind when evaluating the credibility of the testimony.

This is not to suggest that every witness who has an interest in the outcome of a case will testify falsely. It is for you to decide to what extent, if at all, the witness's interest has affected or colored his or her testimony.

If you find that any witness has willfully testified falsely as to any material fact, you have the right to reject the testimony of that witness in its entirety. On the other hand, even if you find that a witness has testified falsely about one matter, you may reject as false that portion of his or her testimony and accept as true any other portion of the testimony which you find credible or which you may find corroborated by other evidence in this case. A witness may be inaccurate, contradictory, or even untruthful in some aspects, and yet be truthful and entirely credible in other aspects of his or her testimony.

The ultimate question for you to decide in passing upon credibility is: did the witness tell the truth before you? It is for you to say whether his or her testimony at this trial was truthful in whole or in part.

### J. Prior Inconsistent Statement

You may have heard evidence that certain witnesses may have made statements on earlier occasions which counsel argue are inconsistent with their trial testimony. If you find that a witness made an earlier statement that conflicts with that witness's trial testimony, you may consider that fact in deciding how much of the trial testimony, if any, to believe.

In making this determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an important fact, or whether it had to do with a small detail; whether the witness had an explanation for the inconsistency; and whether that explanation appealed to your common sense.

It is exclusively your duty, based upon all the evidence and your own good judgment, to determine whether the prior statement was inconsistent, and if so, how much, if any, weight to be given to the inconsistent statement in determining whether to believe all or part of the witness' testimony.

### K. Use of Deposition Testimony

Some of the testimony before you is in the form of depositions which have been received in evidence. A deposition is simply a procedure where the attorneys for one side may question a witness or an adversary party under oath before a court stenographer prior to trial. This is part of the pretrial discovery, and each side is entitled to take depositions. You may consider the testimony of a witness given at a deposition according to the same standards you would use to evaluate the testimony of a witness given at this trial.

## II.    SUBSTANTIVE INSTRUCTIONS

I will turn now to my instructions on the substantive law to be applied to this case.  As you have heard, plaintiff Walid Kamel brings this action against defendant Best Buy, claiming that he was injured when he slipped and fell on a sign that was on the floor when he was walking through a Best Buy store located at 60 West 23rd Street in Manhattan on October 18, 2021.  Plaintiff claims Best Buy negligently maintained its retail store by leaving signage on the floor.  Best Buy has a duty to use reasonable care to keep its store in a reasonably safe condition for the protection of all persons whose presence is reasonably foreseeable.  Defendant denies that the accident occurred and denies that a sign was left on the floor.

The plaintiff has asserted a claim for negligence.  You should consider each element of the claim separately and determine whether the plaintiff has proven the elements of his claim by a preponderance of the evidence.

### A.    Negligence

To recover, Plaintiff must first prove that he fell at the Best Buy store.  If you find that he did not fall at the Best Buy store, you will find in favor of Best Buy and your deliberations are over.

If you find that Plaintiff did fall at the Best Buy store, the Plaintiff must prove that: (1) the Best Buy store was not reasonably safe; (2) that Best Buy was negligent in not keeping the store in a reasonably safe condition; and (3) that Best Buy's negligence in allowing the unsafe condition to exist was a substantial factor in causing Plaintiff's injuries.  The burden of proof rests on Plaintiff to prove all of these elements by a preponderance of the evidence.

### 1.    First Element

First, you must consider whether Best Buy's store was reasonably safe.  Plaintiff claims Best Buy's store was not reasonably safe because Best Buy's employees left signage/advertisement on the floor in an aisle, which presented a slipping hazard.  Best Buy claims that no such signs were on the floor.  If you decide that Best Buy's store was reasonably safe, you will find in favor of Best Buy and your deliberations are over.  If you decide that Best Buy's store was not reasonably safe, you will proceed to consider the second element of whether Best Buy was negligent in creating the unsafe condition.

### 2.    Second Element

Negligence is the failure to use reasonable care.  Reasonable care means that degree of care that a reasonably prudent corporate retail store would use under the same circumstances, taking into account the foreseeable risk of injury.  In deciding whether Best Buy was negligent, you must decide whether Best Buy's employees created the dangerous condition by leaving signage on the floor as plaintiff claims, or either knew or, in the use of reasonable care, should have known, that the signage was left on the floor as plaintiff claims.  If Best Buy did not create the condition by its employees leaving the sign on the floor as plaintiff claims but knew or should have known that signage was laying on the floor as plaintiff claims, you must decide whether Best Buy had sufficient time before the accident to correct the claimed condition, provide reasonable safeguards, or provide reasonable warning.

To find Best Buy negligent, you must find that Plaintiff's presence at the store was foreseeable and that (1) Best Buy created the dangerous condition by its employees leaving the signage on the floor as plaintiff claims or (2) Best Buy either knew of the claimed unsafe condition long enough before Plaintiff's injury to have permitted Best Buy in the use of reasonable care to

have it corrected or to take other suitable precautions and did not do so; or if Best Buy did not know of the claimed condition but in the use of reasonable care should have known of it and corrected it (or taken other suitable precautions).

You will find that Best Buy was negligent if you decide that Plaintiff's presence in the store was foreseeable and that Best Buy created the dangerous condition by leaving the signage on the floor as Plaintiff claims, or in the use of reasonable care should have known, about the signage left on the floor, if any, long enough before Plaintiff's injuries to have allowed Best Buy, in the use of reasonable care to correct it or to take other suitable precautions and Best Buy failed to do so. You will then move on to the third element. On the other hand, if you find that Plaintiff's presence was not foreseeable or that Best Buy did not create the condition by leaving signage on the floor and, further, that Best Buy did not know about or, in the use of reasonable care, would not have been able to discover and remove the signs from the floor or take other suitable precautions before Plaintiff's injuries, then you will find that Best Buy was not negligent and your deliberations are over.

### 3.     Third Element

If you find that Best Buy was negligent you must next consider whether that negligence was a substantial factor in causing Plaintiff's injuries. An act or failure to act is a substantial factor in bringing about an injury if a reasonable person would regard it a cause of the injury. If you find that Best Buy's negligence was not a substantial factor in causing the injury, then Plaintiff may not recover on his claim. If you find that Best Buy's negligence was a substantial factor in causing Plaintiff's injury, you will proceed to consider whether Plaintiff was also negligent.

If you find that Best Buy was negligent and that Best Buy's negligence was a substantial factor in causing Plaintiff's injury, you must next consider whether plaintiff was also negligent

and whether Plaintiff's conduct was also a substantial factor in causing the accident.  With respect to whether Plaintiff's conduct was a substantial factor in causing the accident, here Best Buy has the burden of proof.  Best Buy must prove by a preponderance of the evidence that Plaintiff was negligent and that Plaintiff's negligence was also a substantial factor in causing the accident.  If you find that Plaintiff was not negligent, or if negligent, that his negligence was not a substantial factor in causing the accident, you must find that Plaintiff was not at fault and proceed further.  If, however, you find that Plaintiff was negligent and that his negligence was also a substantial factor in causing the accident you must then apportion the fault between Plaintiff and Best Buy.

Weighing all the facts and circumstances, you must consider the total fault, that is, the fault of both Plaintiff and Best Buy and decide what percentage of fault is chargeable to each.  You will state the percentages that you find in your verdict sheet.  The total of those percentages must equal 100%.

## III.    DELIBERATIONS OF THE JURY

Ladies and gentlemen of the jury, that concludes the substantive portion of my instructions to you.  You are about to go into the jury room and begin your deliberations.  I will now give you a few final instructions on those deliberations.

### A.    Selection and Duties of Foreperson

It is customary for Juror Number 1 to serve as the foreperson, and that is what we will do here.  The foreperson doesn't have any more power or authority than any other juror, and his or her vote or opinion doesn't count for any more than any other juror's vote or opinion.  The foreperson is merely your spokesperson to the court.  The foreperson will send out any notes, and when the jury has reached a verdict, the foreperson will notify the marshal that the jury has reached a verdict, and you will come into open court and give the verdict.

**B.      Right to See Exhibits and Hear Testimony; Communication with the Court**

All of the exhibits admitted into evidence will be sent to the jury room with you.  If you want any of the testimony read, you may request that.  Please remember that it is not always easy to locate what you might want, so be as specific as you possibly can be in requesting portions of the testimony.

Your requests for testimony—in fact <u>any</u> communications with the Court—should be made to me in writing, signed, dated, and timed by your foreperson, and given to one of the marshals. Please make any notes as clear and precise as possible.  Do not tell me or anyone else how the jury stands on any issue until after a verdict is reached and announced in open court by your foreperson.

**C.      Notes**

Some of you have taken notes periodically throughout this trial.  I want to emphasize to you, as you are about to begin your deliberations, that notes are solely to assist you as an aid to your memory.  Do not share your notes with other jurors during deliberations.  Notes that any of you may have made may not be given any greater weight or influence than the recollections or impressions of other jurors, whether from notes or memory, with respect to the evidence presented or what conclusions, if any, should be drawn from such evidence.  All jurors' recollections are equal.  If you can't agree on what you remember the testimony was, you can ask to have the transcript read back.

**D.      Duty to Deliberate**

Shortly, you will retire to decide the case.  You are not to discuss the case unless and until all jurors are present.  A majority of jurors together are only a gathering of individuals. Only when all jurors are present do you constitute the jury, and only then may you deliberate.

You must base your verdict solely on the evidence and these instructions as to the law, and you are obliged on your oath as jurors to follow the law as I instruct you, whether you agree or disagree with the particular law in question.

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement. Each of you must decide the case for himself or herself, but you should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous. Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

Again, you must try to come to consensus but you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors. Each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors. No juror should surrender his or her conscientious beliefs solely for the purpose of returning a verdict.

Remember at all times, you are not partisans. You are judges—judges of the facts. Your sole interest is to seek the truth from the evidence in the case. Nothing said in these instructions and nothing in any verdict form prepared for your convenience is meant to suggest or convey in any way or manner any suggestion or hint as to what verdict I think you should find. What the verdict shall be is your sole and exclusive duty and responsibility.

If you cannot reach a verdict, do *not* report how the vote stands and if you have reached a verdict do not report what it is until you are asked in open court.

### E.    Verdict Form

In a few moments, I will give you the verdict form with the questions for you to answer and you will retire to deliberate your decision.  The questions are not to be taken as any indication that I have any opinion as to how they should be answered.  I have no such opinion, and even if I did, it would not be binding on you.

When you review the verdict form, you will see that each of the questions calls for a "Yes" or "No" answer or some percentage. You should answer every question except where the verdict form indicates otherwise.  You should also proceed through the questions in the order in which they are listed and follow all instructions.  Remember, all answers must be unanimous.

### F.    Return of Verdict

After you have reached a verdict, your foreperson will fill in the verdict form that has been given to you, sign it, and advise the marshal outside your door that you are ready to return to the courtroom.

I will stress that each of you must be in agreement with the verdict sheet which is announced in court.  Once your verdict is announced and officially recorded, it cannot ordinarily be revoked.

## IV.    CONCLUSION

In conclusion, I am sure that if you listen to the views of your fellow jurors, consider all of the evidence, apply your own common sense, and follow my instructions on the law, you will reach a fair verdict here.  Thank you for your time and attentiveness.

**Court Exhibit 7**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WALID KAMEL,

                            Plaintiff,

            -against-                              Case No. 23-cv-00033 (JLR)

BEST BUY CO., INC.,

                            Defendant.

JENNIFER L. ROCHON, United States District Judge:

<u>**SPECIAL VERDICT FORM**</u>

**Please answer each question in order and follow the instructions before moving to the next question. All answers must be unanimous.**

## QUESTION 1

Did Plaintiff fall at the Best Buy store at 60 West 23rd Street on October 18, 2021?

CHECK ONE: YES_____          NO_____

*If your answer is YES, proceed to Question 2.*

*If your answer is NO, <u>do not answer any additional questions</u>, and proceed to the last page of the verdict form and the foreperson should sign the verdict form and alert the Marshal.*

## QUESTION 2

Was defendant Best Buy negligent?

CHECK ONE: YES_____          NO_____

*If your answer is YES, proceed to Question 3.*

*If your answer is NO, <u>do not answer any additional questions</u>, and proceed to the last page of the verdict form and the foreperson should sign the verdict form and alert the Marshal.*

## QUESTION 3

Was the negligence of defendant Best Buy a substantial factor in causing the plaintiff's accident?

CHECK ONE: YES_____  NO_____

*If your answer is YES, proceed to Question 4.*

*If your answer is NO, <u>do not answer any additional questions</u>, and proceed to the last page of the verdict form and the foreperson should sign the verdict form and alert the Marshal.*

**Court Exhibit 7**

## **QUESTION 4**

Was plaintiff Walid Kamel negligent?

CHECK ONE: YES_____ NO_____

*If your answer is YES, proceed to Question 5.*

*If your answer is NO, <u>do not answer any additional questions</u>, and proceed to the last page of the verdict form and the foreperson should sign the verdict form and alert the Marshal.*

## **QUESTION 5**

Was the negligence of plaintiff Walid Kamel a substantial factor in causing the accident?

CHECK ONE: YES_____ NO_____

*If your answer is YES, proceed to Question 6.*

*If your answer is NO, <u>do not answer any additional questions</u>, and proceed to the last page of the verdict form and the foreperson should sign the verdict form and alert the Marshal.*

## **QUESTION 6**

What was the percentage of fault of the defendant and what was the percentage of fault of the plaintiff?

DEFENDANT:    _____%

PLAINTIFF:    _____%

**Total must be 100%.**

*Please proceed to the last page of the verdict form.*

**You have completed all questions.  Please proceed to the signature line below.**

**SIGNATURE LINE**

If this verdict form reflects the unanimous verdict of all jurors, the foreperson shall sign and date the verdict sheet.  Then, without disclosing your verdict, advise the Marshal, that you have reached a verdict and are ready to return to the courtroom to announce your verdict.


_____

Foreperson




Dated:        _____

**23-cv-00033-JLR Kamel v. Best Buy Co., Inc.**

**Date:** Nov 19, 2024

**Time:** 12:24 PM

**Signature of Foreperson:**

Request deposition report regarding the hospital testimony — the defense was questioning.

Also, the deposition of the GM of Best Buy

**EXHIBIT**

8

11/19/2024

PENGAD-Bayonne, N.J.

1    Q.   Now, at some point, sir, after this accident, do you recall

2    going to metropolitan hospital?

3    A.   Yes.

4    Q.   When did you go to metropolitan hospital?

5    A.   It's two or three days after the accident.  I was very much

6    in pain for -- I slept and woke up and I took medications.  It

7    could have been two and it could have been three.  I don't even

8    remember.  Now, they kept on asking me about this question and

9    especially that there's this issue with the metropolitan saying

10   that I told them that I fell yesterday, which is complete

11   nonsense, but that's -- I hardly remember how many nights it

12   was until I decided that this is -- I got to go to the hospital

13   and see what happened exactly, and, you know, whether I went so

14   bad and I'm in so much pain.

15   Q.   When you went to metropolitan hospital, did you tell them

16   about any accident you were involved in?

17   A.   Yes, I and I did say it happened in that BestBuy store and

18   I was shopping in a store and they seemed to have wrote down

19   this nonsense about falling near the hospital.

20   Q.   Near your home, right that's what they wrote?

21   A.   That's what they wrote, I think, that's what my lawyer's

22   telling me.

23   Q.   In fact, you told them you fell where, at a BestBuy store?

24   A.   No, I didn't want to specifically give all the information.

25   I just said I fell in a store while shopping or something like

1    that.

2    Q.  Did you tell them where that store was?

3    A.  No, I didn't.

4    Q.  Didn't you tell them it was downtown?

5    A.  I didn't -- I didn't tell them where is the store at.  I

6    told them I was shopping in a store, I slipped and fell in a

7    store.

8    Q.  Sir, do you recall at your deposition, on page 159,

9    line 11, I just asked you whether or not you told them you were

10   shopping downtown, but at your deposition, do you recall being

11   asked the following question and giving the following answer:

12   "Q.  Did you tell them anything else about the location of your

13   incident?

14   "A.  I don't remember.  You know, I remember telling them I

15   slipped and I was shopping downtown."

16   A.  I may have said something like that because that's the

17   truth.

18   Q.  But you don't recall saying that today?

19   A.  In the hospital?

20   Q.  Just now, I just asked you if you told them you were

21   downtown, you said no.  True?

22   A.  All I remember, like I said, that I did say it happened as

23   I was shopping in a store.

24   Q.  Didn't you just tell the jury it was a BestBuy store that

25   you said you told the hospital people it was BestBuy?

3

```
 1   A.  I don't think so.  Maybe, you know, just to, it's like the
 2   three or four or five guys, the same thing.  You taking me
 3   around and get confused and I go got to try give as best as my
 4   knowledge answer.
 5   Q.  Sir, just about done.  In front of you, exhibit 1, we have
 6   the metropolitan hospital record of October 22, 2021.  Do you
 7   recognize this document?
 8   A.  Can you repeat.
 9            THE COURT:  Use the microphone.
10   Q.  Sir, in front of you is exhibit 1, the metropolitan
11   hospital record of October 22, 2021 do you recognize this
12   document?
13   A.  Not at all.  I have read nothing about this case more or
14   less.
15   Q.  On the top of it, is that your name?
16   A.  Yes, it is.
17   Q.  Do you agree with me that you were seen at metropolitan
18   hospital on October 22, 2021?
19   A.  Yeah, if the accident happened on the 18th, that's almost
20   three days later, two and a half days later or so.  That's
21   exactly what I'm trying to tell you guys.
22   Q.  And do you agree with me that this is a redacted page of a
23   medical record from your medical chart from the hospital of
24   October 22, 2021?
25   A.  Do I agree to that?
```

1    Q.  Right.

2    A.  I'm not an expert to, you know, it says my name and this

3    and that, yes.

4    Q.  Do you have any reason to believe this is not your medical

5    record?

6    A.  I have no -- I can't say.  Could have made it up and I

7    could be -- how would I know?

8    Q.  Sir, let me show you page 2 of exhibit 1.

9    A.  That's my signature.

10   Q.  And is this you consenting to treatment at metropolitan

11   hospital on October 22, 2021?

12   A.  I need the question again.  I'm sorry.

13   Q.  That's your signature, correct?

14   A.  I really think so, yes.

15   Q.  And you signed this in order to give your consent to be

16   treated at metropolitan hospital on October 22; is that

17   correct?

18   A.  Before I -- what?

19   Q.  My question to you, is this you consenting to be treated at

20   metropolitan hospital on October 22, 2021?

21   A.  Whether it's before or after or whatever, it looks like

22   something that I've signed, yes.

23

24

25

1          MR. PRISCO:  The next witness we'll call is the

2    BestBuy mg. Daimeon Dowden.  We'll read some deposition

3    testimony.

4          THE COURT:  Yes, you may.

5          MR. PRISCO:  Thank you, Judge.

6          May I proceed, Judge?

7          THE COURT:  You may proceed.  Thank you.

8          MR. PRISCO:  Going to read page 6, lines 1 to 7.

9    "Q.  You are presently employed by BestBuy, correct?

10   "A.  Yes.

11   "Q.  What's your current position?

12   "A.  I'm currently the general manager of BestBuy on 23rd

13   Street.

14         MR. PRISCO:  Page 6, lines 15 to 17.

15   "Q.  On October 18, 2021, were you the general manager of that

16   store?

17   "A.  Yes.

18         MR. PRISCO:  Page 7, line 17 to 25.

19   "Q.  Okay.  When you walk into the store from the sidewalk, you

20   are on what floor does BestBuy consider that?

21   "A.  So this will be the first floor.  There are three levels.

22   "Q.  Okay.  And then if you go down the escalator to the lower

23   level, what does BestBuy consider that level of the store?

24   "A.  It's the lower level.

25         THE COURT:  Let's read it closely.  It's just the

1    lower level.

2              MR. PRISCO:  Yes.

3              THE COURT:  Go ahead.

4              MR. PRISCO:  Page 8, lines 2 to 9.

5    "Q.  Okay.  What type of items are sold on the lower level?

6    "A.  You have cellphones, you have computers.  So it's the

7    cellphone department as soon as you get be downstairs, there is

8    a computer department, there is a customer service, geek squad,

9    and then home theater department, TVs."

10             MR. PRISCO:  Page 14, lines 12 to 25.

11   "Q.  And besides the electronic price tags, what other kind of

12   signage or tags were up in the lower level of the store in

13   2021?

14   "A.  There was signage of pictures of products in some areas.

15   "Q.  Okay?

16   "A.  Or maybe a vendor sign.

17   "Q.  Okay.  The signage showing the pictures of products and

18   vendor signs, are those two different types of items?

19   "A.  They're about the same types of -- yeah, they are about

20   the same type or same size, same finish, and they go behind the

21   products.

22             MR. PRISCO:  Page 17, lines 16 to 21.

23   "Q.  And the signage that shows pictures of different products,

24   what sizes do those -- does that type of signage come in?

25   "A.  Maybe 24, maybe 30.

1    "Q.   Inches?

2    "A.   Yes.   Sometimes smaller, but yeah."

3          MR. PRISCO:   Page 15, lines 1 through 12.

4    "Q.   Would I be correct to say vendor signs are not put up or

5    installed by BestBuy employees?

6    "A.   Vendor signs are, for the most part, are installed by

7    BestBuy employees.   They are at times third parties, but the

8    most part BestBuy employees.

9    "Q.   On the signage showing pictures of products, would BestBuy

10   employees be the people setting up those signs?

11         THE COURT:   Those types of signs.

12         MR. PRISCO:   Those types of signs?

13   "A.   Majority of the time, yes."

14         MR. PRISCO:   Page 17, lines 22 through 25, and page

15   18, lines 1 through 3.

16   "Q.   How about the vendor signs, what sizes do they come in?

17   "A.   It varies but they are -- it can go from all the way to 11

18   and a half by 10.

19   "Q.   11 and a half by 10 inches?

20   "A.   Yeah."

21         MR. PRISCO:   Page 19, lines 18 through 25, and page

22   20, lines 1 through 25.

23   "Q.   At the 23rd Street store in 2021, did you ever observe a

24   time where, during store hours, BestBuy employees were putting

25   up any type of signage in the lower level of the store?

```
 1    "A.   Yes.

 2    "Q.   How often would they do that?

 3    "A.   Not very often.

 4    "Q.   What type of signs would they change out back in 2021

 5    during store hours?

 6    "A.   Normally, it's smaller than the larger sign we discussed

 7    earlier.

 8    "Q.   Okay.

 9          THE COURT:   Read that answer again.   Normally.

10    "A.   Normally, it's smaller than the larger sign --

11          THE COURT:   It says normally it's small slips, like

12    small inserts.   They are smaller than the larger sign we

13    discussed earlier.   Go ahead.

14          MR. PRISCO:   I want to make sure I don't have an error

15    in my note.

16          THE COURT:   I was reading page 20, lines 3 through 5.

17    "Q.   Okay.   Would they be the size of an iPhone or smaller than

18    an iPhone?

19    "A.   It would be the size of maybe two times the length of an

20    iPhone or so.

21    "Q.   And you said that they would change out small, you would

22    see them change out small slips.   Do the small slip signs

23    differ in any way from the electronic price tags, the signage

24    showing pictures that are being of products being displayed or

25    the vendor signage?
```

```
1    "A.  Yeah, small slips tend to have vendors names or a model
2    number of a series.
3    "Q.  Okay.  So would I be correct to say that back in 2021, at
4    the lower level portion of the store, there is essentially four
5    types of signage that you could encounter, the electronic price
6    tags, the small slips, signage showing pictures of the
7    products, and a vendor signage?
8    "A.  Yes."
9            MR. PRISCO:  Page 18, lines 4 to 6.
10   "Q.  The electronic price tag signage displaying the pictures
11   of the products and the vendor signage, how do they arrive to
12   the store?
13   "A.  They come in shipping boxes.
14   "Q.  What are the boxing made of?
15   "A.  Cardboard.
16   "Q.  When these types of signs are put up, whether it's
17   electronic price tags, the signage, pictures of the products,
18   or vendor signage, when the BestBuy employees are putting them
19   up in the store, do they use any carts to carry out the boxes
20   onto the floor?
21   "A.  Yes."
22           MR. PRISCO:  And then continuing 17 to 22.
23   "Q.  What type of carts do they use to bring the boxes out onto
24   the floor?
25   "A.  It's --
```

1     THE COURT:  Onto the store floor.

2     MR. PRISCO:  Onto the store floor.

3 "A.  It's -- it's normally a cart with four wheels on it.  It

4 has two levels.  But the box or the product or whatever is

5 being put out gets placed on the cart, not on the floor."

6     MR. PRISCO:  Page 18, line 25, continuing to page 19,

7 lines 1 through 17.

8 "Q.  When the electronic price tags or any of the other signage

9 that we discussed that are being installed at the store, is it

10 one employee that would be working, changing out the signs, or

11 would it be multiple people doing that at a given time?

12 "A.  In 2021, my merchandising team consists of two employees.

13 "Q.  Okay.  Who were the two employees?

14 "A.  One, Lesley, her name is Lesley Rodriguez Ponce, and two,

15 Ryan Herder.

16 "Q.  Do they still work for BestBuy?

17 "A.  Ryan Herder no longer works for BestBuy.  Lesley still is

18 employed by BestBuy.

19 "Q.  Does she still work at the 23rd Street store?

20 "A.  Yes."

21

22

23

24

25

1     MR. LEVINE:  I just have some additional read-ins from

2  Mr. Dowden's testimony, as well, for the record.

3     THE COURT:  Yes.

4     MR. LEVINE:  Ladies and gentlemen of the jury, I

5  apologize in advance, I know this is boring, but just like

6  counsel did before, I'm going to be reading as well from a

7  transcript.  I'll try to make it as lively as possible.  From a

8  transcript for testimony previously given in this action from

9  Mr. Daimeon Dowden.  As you saw he was the then general manager

10  for the store.

11     Page 8, line 25, through page 10, line 2.  This is

12  Mr. Prisco asking the questions.

13  "Q.  Back in 2021, was there any policy and procedure that

14  BestBuy had at this particular store with regards to

15  documenting accidents or customer accidents in the store?

16  "A.  Yeah.  So whenever there's a customer accident in the

17  store, the incident gets reported.  We call our incident

18  hotline, everything gets reported and we fill out the injury

19  report saying you know a customer fell or whatever the incident

20  is.

21  "Q.  Is that procedure reporting a customer incident at the

22  store conducted only where a customer asked for this report or

23  would it also be followed by an instance where employees of

24  BestBuy observed a customer have an accident in the store?

25  "A.  It gets done every time there's an incident in the store.

1    "Q.   So in other words, if employees of BestBuy observed a

2    customer fall in the store, but that particular customer didn't

3    request an accident report, how would BestBuy go about getting

4    information needed to complete an accident report?

5    "A.   They will get it from the customer."

6          MR. LEVINE:   Next page 11, line 10.

7    "Q.   Back in October of 2021 on the lower level of the store,

8    did BestBuy employees set up nip type of signs with with

9    regards to the product they had for sale on the lower level of

10   the store?

11   "A.   During off customer hours, yes, there is signage that is

12   set up for different promotions.

13   "Q.   How about during customer hours?

14   "A.   Very seldom because our signage now they are electronic,

15   so there is no need to do any signage work.

16         THE COURT:   You have to finish the rest of the answer.

17   "A.   So most promotions get displayed on electronic signs.

18         THE COURT:   Thank you.

19         MR. LEVINE:   Thank you, Judge.

20         Page 12, line 24.

21   "Q.   So it's the individual tags that existed for each

22   individual item that were displayed at the lower level of the

23   store back in October of 2021, how would those tags -- who

24   would put those tags up?

25   "A.   A merchandising team, but they wouldn't -- the tags are

1    already out.  The tags just change.  They change the tag with

2    an electronic device.

3            MR. LEVINE:  Page 17, line 7.

4    "Q.  Back in October of 2021, what size did the electronic

5    price tags come in?

6    "A.  In terms of measurement, the largest one we do have is the

7    size of an iPhone and the smallest one is probably the size of

8    a key chain.

9            MR. LEVINE:  Page 18, line 17.

10   "Q.  What type of carts do they use to bring the boxes out onto

11   the store floor?

12   "A.  It's normally a cart with four wheels on it, it has two

13   levels, but the box or product whatever is being put out gets

14   placed on the cart, not on the floor.

15           MR. LEVINE:  Page 38, line 4.

16   "Q.  Okay.  Have you ever had an occasion to observe any of the

17   signage that's being displayed on the lower level of the store

18   to be left on the floor?

19   "A.  No.

20           MR. LEVINE:  Page 38, line 19.

21   "Q.  Have you ever done a search of the -- to determine whether

22   there is a written accident report on file within the store for

23   an accident that happened on October 18, 2021?

24   "A.  Yes.

25   "Q.  When did you perform that search?

1    "A.   I do not remember.

2    "Q.   And when you performed that search, you didn't see any

3    accident reports, correct?

4    "A.   No.

5    "Q.   Did you ever perform a search of the accident reports that

6    are on file and in written form in the store, not by date, but

7    by the name of the plaintiff?

8    "A.   Yes.

9    "Q.   Okay.  And when you performed that search, you didn't see

10   any accident reports, right?

11   "A.   No.

12   "Q.   Is there a means for you to perform a search to see if an

13   accident report was reported electronically only?

14   "A.   Yes.

15   "Q.   Did you perform a search to see if there's a electronic

16   report of the accident?

17   "A.   Yes,.

18   "Q.   Nothing came up in that search, correct?

19   "A.   No."

**23-cv-00033-JLR Kamel v. Best Buy Co., Inc.**

**Date:** 11/19/24
**Time:** 3:47 PM
**Signature of Foreperson:**

Request description of Plaintiff testimony of signage

Request deposition of Plaintiff's account of his slip/fall

Request Plaintiff's testimony of his slip/fall

Question — what happens if we cannot agree?

EXHIBIT
10
11|19|2024

**23-cv-00033-JLR Kamel v. Best Buy Co., Inc.**

**Date:** 11/19/2024

**Time:** 4:57 PM

**Signature of Foreperson:**

Request to return tomorrow 10 AM based on jury's availability. Request print vs read outloud of the transcript.

Availability is due to childcare conflict.

EXHIBIT
11
11/19/2024

PENGAD-Bayonne, N.J.

1    51:4.

2    Q.  Did the fall happen in the lower level of the store?

3    A.  Yes.

4    Q.  Where in particular in the lower level of the store did the

5    accident happen?

6    A.  In one of the aisles.

7    Q.  Can you describe for us what happened in regards to this

8    fall?

9    A.  In regards to that fall?

10         MR. PRISCO:  I'll rephrase the question.

11   Q.  How did the accident happen?

12   A.  I was basically looking for the phone section.  I was

13   walking in an aisle, going from one aisle to the to see where

14   the phones are, where they sell the phones.  So I could see

15   that this -- that it shouldn't be in the front for some reason,

16   I couldn't see -- it's different items that they had, so I

17   decided to make a left in one of the aisles.

18   Q.  When you made the left into that aisle, what did you

19   observe?

20         MR. PRISCO:  Withdrawn.

21   Q.  When you made the left-hand turn into that aisle, what, if

22   anything, did you feel?

23   A.  I felt I'm on the wrong aisle because, basically, all I

24   could see is like a white counter.  So that's not where they

25   sell the phones, on both sides, actually, as far as I remember.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300



EXHIBIT

12

11/20/2024

1    So I -- go ahead.

2    Q.   When you made the turn into the aisle, what happened to

3    you?

4    A.   What happened?

5    Q.   Yes.   What happened to you?

6    A.   Well, I was trying to go through the aisle to get that

7    aisle out of the way and go and look for the aisle where they

8    would have the phones, but as soon as I -- I went around those

9    three guys that were standing right on the corner in the aisle

10   itself, and all of a sudden, I see myself flying, not slipping

11   and falling, but flying.

12   Q.   After you went flying, where did your body end up?   After

13   you went flying when you turned in the aisle, where did your

14   body end up?

15   A.   What's the last?

16   Q.   After you turned the corner and went flying, as you said,

17   where did your body end up?

18   A.   Almost towards the end of that short aisle, quite a few

19   feet away where I slipped.

20   Q.   What made you slip?

21   A.   I didn't know what -- at the time, I just flew, felt like

22   over the counter.   The counter was quite high, almost as high

23   as this thing, but a little lower, but I flew over it and I hit

24   the floor.   I was so worried I was going to hit my head against

25   the counter.   And so I twisted a little while I'm flying and

1  landed up on the floor doing a pushup kind of thing, hit my

2  face and my knees and everything, you know.

3  Q.  After you fell, did you have an opportunity to look back

4  towards the beginning of that aisle to see what was there?

5  A.  Yes.  I got up -- the guys came and ran towards me.  They

6  are employees of BestBuy, they had the costumes and all.  And

7  they ran towards me, are you okay, sir, and I said, yeah, yeah,

8  I'm fine.  I wasn't bleeding, I didn't hit the counter, I felt

9  like I fell correctly.  I said, I'm fine, I'm fine, there's

10  nothing, I'm good.  And they helped me stand up.

11  Q.  At the moment you went flying as you turned into this

12  aisle, what, if anything, did you feel underneath your feet?

13          THE WITNESS:  Can we do something with the volume?

14  Because I can't hear very well.

15          MR. PRISCO:  I will have to talk louder.  It's my

16  fault.  I apologize.

17          THE WITNESS:  I had a hard time hearing the guy before

18  him also, so if there's a volume higher, I could use.

19  Q.  When you made the turn in the aisle and you went flying,

20  what, if anything, did you feel under your feet?

21  A.  When -- again.  I'm sorry.

22  Q.  When you made the turn into the aisle and you went flying

23  forward, what, if anything, did you feel under your feet?

24  A.  Just -- I don't know what happened.  I felt like a quick

25  slip, like, you know, very slippery.  But what kind of made me

1   fly, I don't know.

2   Q.  What made you slip?

3   A.  I went back when they helped me up and looked -- I was very

4   curious to see what happened, why did I fly, you know, I was

5   walking in the store.  So I went back to where they were

6   standing and it was a small box on the floor, not a big box,

7   guys, pretty small, like exactly like the USP box, about half

8   of this thing, this wide.  And there were many signs that are

9   extremely slippery, it was probably air in between them.  So

10   they were scattered all over the floor and it was nice moquette

11   floor, it's similar to this floor, but the gray, nice, you

12   know, floor.

13   Q.  Can you describe the signs that made you slip?

14   A.  Yes.  They're exactly like if you have a screen saver here,

15   they look like the computer here, but very, very thin, I don't

16   know how thick they are, but quite thin.  Plastic, very, very

17   slippery, and they were on top of each other, so they were

18   like --

19   Q.  When you used the words describing the sign as a screen

20   saver, what did you mean by that?  Could you elaborate on that?

21   A.  I haven't been able to find the correct words for this

22   description.  It's like the phone protector.

23   Q.  Did the signs appear glossy?  Did they have a gloss or a

24   shine to them?

25   A.  Yes.

1    Q.   Is that what you mean by screen saver?

2    A.   You know, AT&T or whatever, you know.

3    Q.   Is that what you meant by screen saver?

4    A.   It's that what?

5    Q.   I just asked you if the signs appeared shiny or glossy, and

6    my question is:  Is that what you mean when you're using the

7    term, "the signs appeared to look like screen savers"?

8    A.   They're not screen savers, they're like signs that you

9    probably could put a light behind them and they would show

10   through and they're like discount, whatever, AT&T phones

11   connection, this connection, whatever.

12   Q.   When did you first see these signs on the floor in the

13   aisle?

14   A.   After I fell down, got helped by the people, walked back.

15   That's the first thing I wanted to know, why did I fly.  So I

16   went back and checked and actually touched them.  And they have

17   already been scattered all over the floor, so the whole aisle

18   was full of signs by that stage.

19

20

21

22

23

24

25

1   58:18

2   Q.   This accident was over three years ago; is that correct?

3   A.   Yes.

4   Q.   When did the accident take place?

5   A.   October 18th, they say.

6   Q.   What year?

7   A.   2021.

8   Q.   What day of the week was that?

9   A.   I don't recall.

10   Q.   Was it a weekday or a weekend?

11   A.   I can't even tell.

12   Q.   What time did the accident occur?

13   A.   About around 3 o'clock, 3:00 p.m.

14   Q.   Sir, do you remember in this case having your deposition

15   taken?

16   A.   Yes, I have.

17   Q.   Do you remember being under oath and swearing to tell the

18   truth or affirm just like you did just now?

19   A.   Yes.

20   Q.   Was that your intent at that deposition, to truthfully

21   answer the questions that were given to you?

22   A.   Can you repeat that.

23   Q.   At your deposition, was it your intent to answer

24   truthfully?

25   A.   Absolutely.

1    Q.   Now, do you recall at that deposition being asked what time

2    of day your accident took place?

3    A.   Yes.

4    Q.   Do you recall what you said in response?

5    A.   I mean, I was asked 2,000 questions about the minute -- the

6    three seconds.  So it was kind of ridiculous as far as I'm

7    concerned because I could have explained it and there would

8    have been no questions.

9    Q.   Sir, do you remember at your deposition under oath being

10    asked the following question, it's page 39 --

11    A.   Could you speak into the mic, please, because I do have a

12    hearing issue.  I'm sorry.

13    Q.   Page 39 --

14            MR. PRISCO:   What deposition?

15            MR. LEVINE:   It will all be the November 8 deposition.

16            THE COURT:   Tell him where you're going to point to

17    first before you ask him so I can make sure there's an

18    inconsistency, please.

19            MR. LEVINE:   Yes.  Page 39, lines 13 through 23.

20            THE COURT:   Thank you.  Go ahead.

21    Q.   Sir, do you recall being asked:

22    "Q.   Approximately what time in the afternoon was your

23    accident?"

24    A.   Yes, I was asked that, I'm sure, yes.

25    Q.   Do you recall giving the following answer:

1   "A.   Somewhere maybe after 3 o'clock.   I would say 7 o'clock or

2   so.   Somewhere between 3 o'clock and 8 o'clock."

3   Q.   Do you recall saying that?

4           THE COURT:   You have to give the complete answer,

5   please.

6   "A.   Like it was light."

7   Q.   Do you recall saying that?

8   A.   Yes, it was before sunset most definitely.

9   Q.   But it could have been 8 o'clock at night?

10  A.   No, before sunset.   At least an hour before the sunset.   I

11  got home when it was light.

12  Q.   Well, didn't you say it could have been 7 o'clock or

13  8 o'clock in the evening?

14  A.   I may have, but I was getting really frustrated with the

15  many, many, many questions that's about the same thing from

16  this deposition, that I was quite confused.

17          By the way, I'd like to state that, just in case we

18  get to it, I answered some of the questions because you kept on

19  asking about the same thing four, five times, and I've just

20  answered.   So at one of the times I remember answering,

21  assuming that we'd move to another point, so when I came back,

22  for example -- anyway.

23  Q.   Well, your answer you just gave about the accident

24  occurring either at 3 o'clock or 7 o'clock or 8 o'clock, was

25  that based on some assumption of a different question?

1   A.   I didn't look at my watch and I don't know.   It's somewhere

2   between noon and afternoon, basically.

3   Q.   Sir, I see you're wearing glasses today, correct?

4   A.   Yes.

5   Q.   What do you wear glasses for?

6   A.   Near and far sight.

7   Q.   Was that also the case at the time of the accident?

8   A.   Most likely, yes.

9   Q.   Do you wear the glasses all the time?

10  A.   Yes.

11  Q.   At the time of your accident, were you wearing your

12  glasses?

13  A.   I would say so, most definitely yes.

14  Q.   Sir, again, do you remember at your deposition, page 46,

15  line 25.

16          MR. PRISCO:   Again, is this the November 8th

17  deposition?

18          MR. LEVINE:   They're all 8.

19  Q.   Sir, do you recall being asked the question:

20  "Q.   Were you wearing your glasses when this incident occurred?

21          THE WITNESS:   I just remember it now.

22          THE COURT:   Wait.  Wait.  Wait.

23          THE WITNESS:   Go ahead.

24  "A.   I don't remember if I had glasses on or not.   I have no

25  problem seeing."

1  Q.  Do you recall saying that under oath?

2  A.  I what?

3  Q.  Do you recall saying that under oath, that you didn't

4  remember if you had your glasses on?

5  A.  What?

6          THE COURT:  Let's start it again.  Why don't you read

7  the question and answer and --

8          THE WITNESS:  And speak in the mic, please, because I

9  not hearing.

10  Q.  At your deposition, sir, under oath, you were asked whether

11  or not you were wearing your glasses when the accident

12  occurred.  Do you recall saying, sir, answering as follows:

13  "A.  I don't remember if I had glasses or not.  I have no

14  problem seeing."

15  Q.  Do you recall testifying to that?

16  A.  Look, I wear my glasses -- to get to the bottom of this, I

17  wear my glasses all the time.  I cannot -- I shouldn't -- I'm,

18  you know, I'm in the streets, I'm looking for stuff in stores,

19  so I most definitely had my glasses on.  At the time, when I

20  got asked that question, I didn't remember because they didn't

21  break.  I hit my face and my nose and my chin to the floor.

22  And I don't remember what happened to my glasses, whether they

23  fell on the floor, what happened exactly, why didn't they

24  break, I don't know.  So I answered to the best of my ability.

25  And I am now, too.

1    Q.   You weren't asked whether your glasses broke or fell off,

2    you were simply asked whether you had them on or not and you

3    didn't remember; is that true?

4    A.   I must have because I wear my glasses.

1   64:16

2   Q.  Sir, what were you wearing on your feet at the time of the

3   accident?

4   A.  Sneakers most likely.

5   Q.  Do you still have those sneakers?

6   A.  I don't recall if they were actually sneakers or --

7   Q.  Sir, you don't recall what you had on your feet at the time

8   of the accident?

9   A.  I wear sneakers all the time.  They're most likely to be

10  sneakers.  I don't remember which ones three years later.

11  Q.  And you got rid of the sneakers?

12  A.  I have no idea.  I be honest with you.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    65:21
2    Q.  Now, at the time of the accident, sir, how was the store in
3    terms of crowd conditions, was it busy, was it quiet, something
4    else?
5    A.  Not so busy and not so empty either.
6    Q.  Sir, at your deposition, do you recall being asked about
7    the crowd conditions of the store?  And I'll refer you to page
8    55, line 23.
9    A.  No, I don't recall any question about the crowd of the
10   store, no.
11   Q.  Sir, do you recall being asked:
12   "Q.  At the time of day right before your accident occurred,
13   was the store crowded, empty, or something else?
14   "A.  No -- yes.  Quite a few people.  After I had the accident,
15   I sat down in a chair for quite some time, maybe 25 minutes or
16   so, and there was a line in front of me, but the actual store
17   was not crowded from people.  No, it was quite empty aisles."
18   A.  But it was quiet empty aisles.
19   Q.  Yes.
20   A.  So it's not busy and it's not full.  That's what I said
21   back then, as you're saying, and that's what I'm saying now.
22   Q.  Sir, where your accident occurred, what section of the
23   store was that?
24   A.  I don't know.  It looked like the counters quite empty
25   actually.  I've been asked the position, what aisle they were
```

1    selling on this aisle, and as far as I remember, all I see

2    while I'm flying, I see white counter.  And I think there's

3    nothing displayed.  I think it might have been, like, doors

4    that close like that or something, but it looked just basic

5    light.  I can't remember what was on the other side, so I don't

6    know what they were selling or if they were selling anything in

7    that aisle.

8    Q.  So in the aisle where your accident occurred, was there

9    anything for sale or anything on display?

10    A.  Not that I recall at all.  The counters were empty and the

11    actual aisle side, like this was -- I don't remember seeing any

12    items being sold that I was afraid to hit or something.

13    Q.  So it's your testimony, sir, that there were signs being

14    put out or laying on the floor or in a box in an aisle where

15    there's nothing on display, nothing for sale?

16            MR. PRISCO:  Objection to form.

17            THE COURT:  Overruled.

18    A.  Yes.

19            THE WITNESS:  I don't even know what's overruled.

20            THE COURT:  So you need to answer the question.

21            And perhaps you can ask it again, Mr. Levine.

22    Q.  Sir, is it your testimony under oath today that the aisle

23    where your accident occurred where they were putting signs out,

24    that there's nothing for sale and nothing on display?

25    A.  Well, I don't know if there was anything being sold in this

1    aisle.  Is that a sufficient answer?

2    Q.  Sir, whatever answer you give is your answer.

3    A.  That is my answer.  I don't remember.  I just saw white

4    counter, formica on the right.  I was flying.  I wasn't trying

5    to see what they're selling in this formica thing when I'm

6    flying or when I fell down and I walked back.

7    Q.  Either before or after your accident, did you see anything

8    for sale or anything displayed or not?

9    A.  I think as soon as I got in -- sorry to interrupt you.  I

10   think as soon as I got to that aisle, I realized that it's not

11   the aisle where they sell the phones because there's nothing I

12   think there.  So I needed to walk fast out of this aisle and

13   look for what I'm looking for.

14

15

16

17

18

19

20

21

22

23

24

25

1   70:3

2   Q.  Sir, do you remember at your deposition on page 62, line,

3   23, being asked the following question:

4   "Q.  The aisle is where you say your accident happened, you

5   made a left turn.  When you made the left turn into that aisle,

6   did you see any BestBuy employees in the aisle where you say

7   your accident occurred?

8   "A.  There was no one in the aisle."

9   A.  No.

10  "A.  The corner of the aisle, I was turning to the left.  To

11  left of me was four guys standing there right next to my left

12  around the corner, not deep in the aisle.  The aisle was

13  completely empty likely.

14  A.  Can you say that again?  I'm sorry.  It's the way she was

15  asking the questions.  It was so silly that she's asking 200

16  questions and I could have, you know, like I explained it,

17  there was three guys standing next to the corner, I passed

18  them, I tried not to hit them with my shoulder, and I started

19  flying.  That's basically it.  I don't know what all these

20  questions are about.  I'm sorry.

21

22

23

24

25

```
1   72:15
2   Q.  Now, the three or four men you saw in the aisle, what were
3   they doing?
4   A.  They were standing, talking.
5   Q.  That's all they were doing?
6   A.  Yeah.  It was a box underneath them, you know, between
7   their feet.
8   Q.  Sir, do you recall being asked, on page 75, line 23, the
9   following question:
10  "Q.  These four men you saw talking, were they also performing
11  any type of work?
12  "A.  Yes, they were working on the signs, putting up a sign
13  somehow.  I don't know.  I didn't look."
14  Q.  Do you recall saying that?
15  A.  Well, I saw them for one second, sir.  She asked over 30
16  questions about me seeing them, what happened, okay.  So I saw
17  them for one single second and I didn't give much attention
18  because I wasn't looking at these guys, I was looking at the
19  phones.
20  Q.  Sir, didn't you just tell this jury a few minutes ago that
21  you didn't know what they were doing, they were just talking?
22  A.  No, I said they were talking, and obviously they were
23  putting out the signs because the signs I slipped on.
24
25
```

77:7

Q.  Sir, you described before that the sign you slipped on was something like plastic, I believe you said?

A.  It's like this size of plastic, very thin, shiny plastic.

Q.  And the plastic you're referring to, you had your hands out, it was about two feet, the size of this plastic?

A.  They are about this size and maybe a little -- the box I think is the exact size of the UPS, you know, this size of a box and this long.

THE COURT:  Can you describe for the record.  Show me again.

THE WITNESS:  It was a brown box with no writing, I think, on it or anything.  Just about this size and this long.

THE COURT:  Let the record reflect that the witness is holding his hands about one foot apart.

Would you agree, Mr. Prisco?

MR. PRISCO:  I have no objection.  I will stipulate to that.

THE COURT:  About one foot apart.  Go ahead.

Q.  Sir, at your deposition, don't you recall testifying that the box you saw on the floor was 22 by 24?

A.  I don't think I can figure how big it is.  I used to ship UPS and I think it was about the same size.

Q.  The dimensions you just gave, is that the size of the screen saver that you slipped on or was it bigger or smaller?

1   A.   Again.   Sorry.

2   Q.   What you actually slipped on, what --

3   A.   It was about this size, a little smaller than this

4   computer.   About this size and this size.

5   Q.   Was it larger?

6   A.   Actually, it's a standard size, I think, or this size.

7   Q.   What you slipped on, was it the same size, smaller or

8   larger than the cardboard box you referred to?

9   A.   They fit in the box, so they were about the same size.   I'm

10  certain they're a little smaller than the actual box to slide

11  in and out.

12  Q.   And again, you said you slipped on something plastic,

13  correct?

14  A.   Yes.

15

16

17

18

19

20

21

22

23

24

25

1      79:13

2      Q.  Sir, was the sign you slipped on, or one of the signs, did

3      it have a metal frame?

4      A.  No, I didn't say anything about metal or I didn't intend to

5      say anything about the signs on the bottom.

6      Q.  The signs --

7      A.  On the floor.

8           Now, on that white counter, these signs, if they put

9      them in a screen like this in front of me, then there would be

10     an edge to that thing they put these signs in, for them to

11     install the signs.  I think I saw one of these things next to

12     the guys on the counter.  It has a mirrorrish frame or chrome

13     frame with no sign in it maybe.  I can't remember.  It's three

14     years later.

15     Q.  So the plastic sign you slipped on had some sort of mirror

16     or metal frame to it?

17     A.  No.  No.  No.  I'm making it clear again.  It's like paper

18     is sticking out of the box scattered all over the floor.  They

19     were just colored papers.  But they're not papers, they're

20     plastic, thin.  They're like a thin type of cutting board or

21     something, but very thin and very shiny.  I mean very slippery.

22     I don't even know how shiny they were.

23     Q.  But did the sign you slipped on have some or metal or

24     mirror-like trim?

25     A.  No, just plastic, slippery stuff.

1    Q.   Page 78, lines 18 through 24.

2                THE WITNESS:  If I may --

3                THE COURT:  Wait.  Wait.  Wait.  Wait.

4                THE WITNESS:  I'm sorry.

5                THE COURT:  That's all right.  Wait one moment.

6                Go ahead.

7    Q.   Sir, do you recall being asked the following question:

8    "Q.  Now this sign, could you read what this sign said?

9    "A.  No, I can't remember what was inside.  It might have said

10   T-Mobile or something.  It was just a sign --

11   A.   I might have been right --

```
1    84:4

2    Q.  Sir, as a result of slipping on the signs, your body went

3    upwards; is that correct?

4    A.  Yes.

5    Q.  In fact, you went to the other side of the aisle, correct?

6    A.  No.

7    Q.  You didn't end up on the other side of the aisle?

8    A.  What do you mean the other side?  Over the counter?

9    Q.  I'm asking you, sir, did you end up, as a result of

10   slipping and -- you flew through the air; is that correct?  Did

11   you fly through the air?

12   A.  Yes.

13   Q.  And where did you end up when you were done flying?

14   A.  A few feet in the aisle on the carpet.

15

16

17

18

19

20

21

22

23

24

25
```

```
1    87:4

2    Q.  Sir, as a result of slipping and flying through the air,

3    did you end up at the end of the aisle?

4    A.  I would say so, yes.  It was a shortish aisle, white

5    counter.  And I believe where my hand hit the floor, it was

6    almost the end of the aisle.

7    Q.  Now, sir, you said before that the signs, were they

8    generally the same size as the cardboard box that was on the

9    ground?

10   A.  There was signs sticking out of the box that this box is

11   made for these signs, so they must have been slightly smaller

12   than the box to fit in the box.

13   Q.  And again, sir, you put your hands out at the dimension of

14   the box, and you had about one foot, correct?

15   A.  It could have been like this size --

16           THE COURT:  You have to describe it.

17   A.  The size of that square here maybe, yeah, about that square

18   here.  I would settle for that.

19           THE COURT:  So we are pointing now to the size of the

20   computer screen in fronts of Mr. Kamel.

21           And what would you say, Mr. Prisco?

22           MR. PRISCO:  Approximately a foot and a half.

23           THE COURT:  Maybe a foot and a half, Mr. Levine?

24           MR. LEVINE:  I'm using the same screen.  It looks

25   closer to two feet, Judge.
```

1          MR. PRISCO:  Approximately two feet is okay with me.

2          THE COURT:  So it's the size of the computer screen in

3     front of you.

4          THE WITNESS:  Not the whole thing.  From here to there

5     and from here to there.  About this size, this thing.

6          THE COURT:  You have to give us the measurements.

7          THE WITNESS:  I think this is 22 centimeters.  So

8     would that be a foot?  No.

9          THE COURT:  So it's smaller than the computer screen

10    in front of you?

11         THE WITNESS:  None of you can give us this estimation,

12    then why should I be able to?

13         MR. PRISCO:  Your Honor, by counsel, I would say it's

14    no greater than two feet; is that fair, counselor?

15         MR. LEVINE:  Yes.

16

17

18

19

20

21

22

23

24

25

1    90:6

2    Q.  Now, sir, you testified in response to your attorney's

3    question that after the accident, you touched a sign; is that

4    correct?

5    A.  Yes.  I got up, they helped me up, and I walked back and I

6    felt -- I saw the signs scattered, and I felt them, how

7    slippery they were where, and they were extremely slippery.

8    Q.  So you touched the signs with your hand, correct?

9    A.  Yes.

10   Q.  Sir, at your deposition, page 118, line 13:

11   "Q.  Did the box have any writing on it?

12   "A.  I don't think so --

13   A.  Did the box have any --

14          THE COURT:  Just speak slowly and into the microphone.

15   Just listen.  Don't answer yet.

16          Go ahead.

17   "Q.  Did the box have any writing on it?

18   "A.  I don't think so.  I think it was plain brown, you know,

19   regular-type signs or something.  I don't know.  It was just an

20   open flat box.

21   "Q.  Were signs slipping out of it?

22   "A.  I didn't touch the signs.  I slipped off so fast.

23   A.  I didn't touch them before and after.  This is what I was

24   trying to say, guys, earlier.  In that deposition, I was asked

25   200 questions about three seconds, and some of the answers I'm

1    not satisfied about because I was confused.  I couldn't believe

2    that she's asking me the same question again.

1    91:14

2    Q.  Sir, let me show you some exhibits we've marked.

3              MR. LEVINE:   These are all exhibit 2, your Honor.

4    Q.  Sir, do you see what's on the screen in front of you?

5    A.  Yes, sir.

6    Q.  It's a picture of a sign that says, "Welcome to Magnolia,"

7    correct?

8    A.  Yes.

9    Q.  Was this one of the signs that was in the aisle you slipped

10   on?

11   A.  I would think so.  They were a bluish and greenish kind of

12   thing.

13   Q.  The next exhibit that says, "picture with --

14   A.  No, it's not even the type of signs, guys.  It's a lot

15   smaller, as we talked about, and you bringing two feet to the,

16   you know, the count.

17   Q.  The sign, it says, "Need Help Now."  Was that one of the

18   signs that was in the aisle you slipped on?

19   A.  I doubt it.  This is huge comparing to the other ones we're

20   talking about.

21   Q.  The next exhibit, it says "Battery Center" on the top.  You

22   see those little things at the end of the pegs?

23   A.  Where it says "Energizer"?

24   Q.  No.  Let's start below that.  Do you see at the end of the

25   pegs for the various display --

1    A.   What pegs?

2    Q.   Those metal pegs that stick out with items on them?

3    A.   Okay.   You call these pegs?

4         THE COURT:   Wait until the question is done.   Two

5    people cannot speak at the same time.

6         Go ahead, Mr. Levine.

7    Q.   Sir, do you see at the end of the pegs those white

8    rectangle little signage?

9    A.   I quite honestly can't believe that after I showed you the

10   measurements, you're asking me if these little ones are --

11        THE COURT:   He he's asking you if you see those on the

12   page.   Do you see them on the page?

13        THE WITNESS:   I see them here.

14        THE COURT:   Good.   Now ask your next question.

15   A.   I see these things, yes.

16   Q.   Are those what you slipped on?

17   A.   That's what I can't believe you're asking me because I've

18   been saying they're this big and you're giving me these big,

19   and I can't understand why would you ask a question like that,

20   quite honestly.   Like her, she did the same thing, too,

21   repeatedly 20 times, confusing it.

22        THE COURT:   That's okay.   Let's answer the question.

23        Were those the signs that you slipped on?

24        THE WITNESS:   No.

25        THE COURT:   Mr. Levine, next question.

1           MR. LEVINE:  Thank you.

2    Q.  At the top of this exhibit, sir, you see the blue signs,

3    one says "Energizer," one says "Battery Center," are those the

4    signs you slipped on?

5    A.  Well, I will not tell you these or not these, but they are

6    similar to these, because I didn't read the signs.  I've

7    answered all these questions back then and now.  I did not read

8    the signs, I did not see what's in the signs, I've slipped on

9    the signs and went back and touched them and realized that

10   they're plastic.  Very slippery stuff.

11   Q.  Let me ask you this, sir --

12   A.  Pretty big, not like these little things at all, not like

13   the two-meter thing that you showed us earlier.  None of this

14   stuff.

15   Q.  Sir, if put up, would you be able to recognize the types of

16   signs or the signs you slipped on --

17   A.  No, I wouldn't.

**23-cv-00033-JLR Kamel v. Best Buy Co., Inc.**

**Date:**  11/20/24

**Time:**  11:32 AM

**Signature of Foreperson:**

Request the testimony of Ms. DeLeon.

EXHIBIT
13
11/20/2024

OBlCkamT          DeLeon - Direct

1          THE COURT:  Plaintiff rests.

2          Mr. Levine, you may call your first witness.

3          MR. LEVINE:  Thank you, your Honor.

4   LARIANA DELEON,

5          called as a witness by the Defendant,

6          having been duly sworn, testified as follows:

7          THE DEPUTY CLERK:  Can you please state and spell your

8   full name into the record.

9          THE WITNESS:  My name is Lariana DeLeon, spelled

10  L-A-R-I-A-N-A, last name DeLeon, D-E-L-E-O-N.

11         THE COURT:  Thank you.

12         Mr. Levine, you may proceed.  Please make sure that

13  you speak into the microphone.  Thank you.

14         MR. LEVINE:  Thank you, your Honor.

15  DIRECT EXAMINATION

16  BY MR. LEVINE:

17  Q.  Good afternoon, Ms. DeLeon.

18  A.  Good afternoon.

19  Q.  Before today, have we ever met?

20  A.  No.

21  Q.  How old are you, ma'am?

22  A.  I'm 33.

23  Q.  And where do you live?

24  A.  I live in the Bronx.

25  Q.  And could you tell the jury your background a little, let's


EXHIBIT
14
11/25/2024

OBICkamT          DeLeon - Direct

1    start with your education.

2    A.   I actually graduated high school at Murray Bergtraum, and I

3    studied business administration at Borough of Manhattan

4    Community College.

5    Q.   And did you graduate?

6    A.   I did not graduate.

7    Q.   What years did you go to school?

8    A.   It was just like my first year after that, I just started

9    working at BestBuy.

10   Q.   So how long have you been working for BestBuy?

11   A.   For 15 years.

12   Q.   Do you still work there presently?

13   A.   Yes.

14   Q.   If I might pry a little bit, a little background.  Are you

15   married?

16   A.   No.

17   Q.   Do you have any children?

18   A.   No.

19   Q.   When you first started with BestBuy, in what position were

20   you employed at?

21   A.   I started as a seasonal employee, rec 1, which is a

22   cashier.  I then got kept on after the holiday season as a

23   part-timer.  I was a part-timer for about a year and then I

24   became a full-time employee helping out at customer service.

25   After that first year as a full-timer, I was able to take on a

OBICkamT          DeLeon - Direct

1   leadership role of taking care of cash management

2   responsibilities.  I did that for a few years and then I became

3   a supervisor for the front end team.  After three years of

4   being a supervisor, I became a manager for BestBuy and I've

5   been a manager for the last three years.

6   Q.  And at what store or stores were you a manager of?

7   A.  I've been a manager at the store on 23rd and Sixth Avenue,

8   the store in NoHo, which is no longer open, and currently at

9   Union Square.

10  Q.  And were you working at the BestBuy store on 23rd as of

11  October 2021?

12  A.  Yes.

13  Q.  And what position did you hold at that time?

14  A.  I was an experience manager.

15  Q.  Please tell the jury what are the duties and

16  responsibilities of an experience manager.

17  A.  We're in charge of being able to take care of the sales

18  floor, make sure customers are being taken care of.  We

19  supervisor employees on their daily tasking.  Just running the

20  overall business, making sure that we're as profitable as

21  possible and ensuring that policies and procedures are in

22  place.

23  Q.  By the way, are you being paid to come here today for your

24  testimony?

25  A.  I'm a salaried manager, so I'm always on the clock.  This

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   is part of my responsibilities to be here today.

2   Q.  And in your position as experience manager, did you undergo

3   any training?

4   A.  Yes.  Every position that we've had, we always have to go

5   through training.  It starts off with what we call E-Learnings,

6   they're done at a work station.  We do videos and quizes and

7   different activities.  That goes on to then shadowing another

8   individual on the sales floor or in different areas of the

9   store, kind of applying those trainings.  And then we would

10  train with somebody who is already in the position.  So as a

11  supervisor, I trained with another supervisor.  As a manager, I

12  trained with another manager and so on and so forth.

13  Q.  And, ma'am, do you undergo any training with respect to

14  let's say safety, safety around the store?

15  A.  Yes.  So part of our trainings that we do on the work

16  station, they include safety behaviors and reporting

17  distinction.  This is something that we also shadow with other

18  leadership teams throughout the store, as well, and it's a

19  course we have to take every single year.

20  Q.  Now, ma'am, while you were waiting outside, I believe you

21  were outside in the lobby of the courtroom.  Did you see the

22  gentleman, the plaintiff in this lawsuit out there?

23  A.  I saw people walking by, yes.

24  Q.  Did you see a gentleman with a cane who walked into the

25  courtroom?

OBICkamT            DeLeon - Direct

1    A.   Yes.

2    Q.   Did you recognize that person?

3    A.   No.

4    Q.   Have you ever seen that person prior to today?

5    A.   No.

6    Q.   Do you have any knowledge of, from any source, ever heard

7    about or witnessed or been involved with anyone who claims they

8    slipped and fell in the BestBuy store on signs or signage that

9    was on the floor?

10   A.   About a year ago, my general manager Daimeon had asked me

11   if I had recalled an incident that had happened, but I did not

12   have any recollection.  We tried to search in our systems, too,

13   where we report our incidents and we didn't see anything in

14   there, as well.

15   Q.   Are you talking about this incident?

16   A.   Yes.

17   Q.   Other than this incident, are you aware of anyone who ever

18   claimed they slipped and fell on signs on the floor?

19   A.   No.

20   Q.   And in terms of the allegations made by Mr. Kamel in this

21   case, do you have any knowledge of those?

22   A.   No.

23   Q.   To your knowledge, did anyone from BestBuy have ever have

24   any knowledge of Mr. Kamel's claimed accident?

25   A.   No.

OBICkamT          DeLeon - Direct

1    Q.   When you first learned of it, you said last year, 2023?

2    A.   Yes.

3    Q.   When that occurred, did you do an investigation?

4    A.   It was mostly just looking into the system to see if there

5    was some type of incident reported where somebody slipped on a

6    sign.

7    Q.   And was there anything found?

8    A.   No.

9    Q.   And was a search also made by Mr. Kamel's name?

10   A.   Yes.

11   Q.   Was anything found?

12   A.   No.

13   Q.   And does the store have a policy in terms of reporting

14   accidents when people claim they fell or if they actually do

15   fall, is there any sort of documentation made for that?

16   A.   Yes.

17   Q.   Explain that to the jury, please.

18   A.   So if anything were to happen in the store where a customer

19   has any type of incident, we are required to be able to report

20   that into the system with as much detail as possible, and we

21   also report it whether the customer wants to talk to an

22   employee or they don't.  Every employee has to be on the same

23   page that if they see something, they have to report it to a

24   leadership team so we can keep it documented, as well.

25   Q.   So if someone came in the store, slipped and fell on

OBICkamT          DeLeon - Direct

1   something, fell to the ground and that was witnessed by BestBuy

2   employees, would that be something that BestBuy employees have

3   an obligation to do something with?

4   A.  Yes.

5   Q.  What would they do?

6   A.  They have to report it to a leadership on duty.

7   Q.  And leadership, would that include you?

8   A.  Yes.

9   Q.  And what would leadership then do with that information?

10  A.  One, we would go to the person to see if they are okay,

11  just to see if they need any immediate medical attention,

12  whether it be an icepack, first aid, or if we have to call for

13  an EMT into the store.  After that, we would take down all of

14  their information, first name, last name, phone number,

15  address, and then a description of what may have happened from

16  their point of view.  After that, we would gather information

17  from any witnesses that were in the area and any employees that

18  we saw.  And we would gather all that information and also

19  follow up through video surveillance to see exactly what may

20  have happened in that situation.  Once we gathered all the

21  information, we would then input it into our system so that way

22  it is reported properly to our company's standards.

23  Q.  What if the accident is not reported -- or there's an

24  accident, the person says, I don't need to fill out an accident

25  report, I'm okay, and leaves the store?

OBICkamT          DeLeon - Direct

1   A.   We're still obliged to report it in through the system.   If

2   we don't have any information, we would just report it as John

3   or Jane Doe.   But we would fill in all the information again if

4   there was any type of employee witness and we would still go

5   back into the system to check through video surveillance what

6   may have happened.

7   Q.   Now, did you take a look to see if there was any John or

8   Jane Doe incident on falling on signs for October 2021?

9   A.   Yes.

10  Q.   Was there anything?

11  A.   No.

12  Q.   And you mentioned a video.   Does the BestBuy store have

13  video cameras throughout the store and parts of the store?

14  A.   Yes, we have video surveillance all over the store.

15  Q.   Is that recorded, that video surveillance?

16  A.   We record every single day.   The system does rewrite itself

17  every 30 days though.

18  Q.   What do you mean by "rewrite itself"?

19  A.   So, we don't have access to go back more than 30 days, if

20  something were to happen, unless we went in there and actually

21  recorded it to save it.

22  Q.   And to your knowledge, did Mr. Kamel ever report his

23  accident on the day of it?

24  A.   No.

25  Q.   To your knowledge, did he ever make any report to BestBuy

OBICkamT          DeLeon - Direct

1   or contact BestBuy in any way within 30 days after the

2   accident?

3   A.   No.

4   Q.   To your knowledge, did he ever report it at any time?

5   A.   No.

6   Q.   And based upon your investigation after you learned of the

7   accident and you were advised it was a claim of someone

8   slipping on signage, did you do any investigation in terms of

9   who would be responsible, who might be responsible for signage?

10  A.   Not necessarily.  We usually have a merchandising team that

11  is pretty set.

12  Q.   So in October 2021, how many people were on the

13  merchandising team?

14  A.   It's two people we generally had in the merchandising team.

15  Q.   As of that time, what were the names of those people?

16  A.   Back then it was Ryan Herder and Lesley Rodriguez.

17  Q.   And Ryan is a gentleman, I presume?

18  A.   Ryan is a gentleman, yes.

19  Q.   Lesley a woman?

20  A.   Yes.

21  Q.   Are they still with BestBuy, either of them?

22  A.   No, they're not with BestBuy anymore.

23  Q.   And how about Daimeon Dowd, is he still with BestBuy.

24  A.   Not anymore.

25  Q.   They've all left the company?

OBICkamT          DeLeon - Direct

1    A.   Yes.

2    Q.   For whatever reason?

3    A.   Yes.

4    Q.   Now, the allegation in this case is that BestBuy employees

5    were putting out signs or working on signs or had a box, a big

6    cardboard box of signs that was on the floor.  Have you ever

7    heard of anything of that nature?

8    A.   No.  Signage is usually shipped to the store individually

9    so that they don't get damaged, and they're very rarely

10   replaced throughout the store, and it's generally done before

11   the store opens.  So employees are scheduled for merchandising

12   between 6:00 and 7:00 a.m., and that's where they would take

13   care of a lot of those activities around the store.

14   Q.   So how often is signage put out?

15   A.   Very rarely, usually when there's a new product that's come

16   out, it needs to be replaced, but generally we don't really

17   replace the signs.

18   Q.   And when they are replaced, that's done you said between

19   6:00 and 7:00 a.m.?

20   A.   6:00 and 7:00 a.m., our merchandising team comes in.

21   Q.   What time did the store open in October 2021?

22   A.   We would have opened at 10:00 a.m.

23   Q.   Now, were there occasions or had there been occasions in

24   the last several years where, for whatever reason, signs might

25   have been put up during the day?

OBICkamT          DeLeon - Direct

1    A.  Very rarely.  We usually update smaller signs throughout

2    the day, but it rarely happens.

3    Q.  In terms of the signage, how it's received by BestBuy or

4    how it's stored, how is that done?  In other words, plaintiff

5    in this case says there was a box full of signs, a big

6    cardboard box, one foot or two foot on the floor.  With that in

7    mind, is that correct in terms of BestBuy signage or is it

8    something different?

9    A.  BestBuy signage usually comes individually in a very thin

10   cardboard box, and usually they're rolled out onto the floor

11   using a cart, but this would have been done before the store

12   opens, as well.  We don't have a big cardboard box of signage.

13   They're all individually shipped to the store, again, so that

14   they're preserved and so they don't get damaged.

15   Q.  When they're shipped to the store, what are they shipped

16   in, what's the packaging that's used?

17   A.  It's in a cardboard box, a small, thin cardboard box that's

18   flat so that the sign doesn't get damaged, or it would be in an

19   envelope.

20   Q.  And the box, is that pretty much just larger than the sign

21   itself?

22   A.  It's just the same size as the sign, and it's usually like

23   an inch or maybe half an inch because it just holds the one

24   sign inside the box.

25   Q.  So is it like a pizza box or even thinner than that?

OBICkamT          DeLeon - Direct

1    A.   It's thinner that.   It's like half an inch.

2    Q.   I know when you have the smaller items that are on display

3    like batteries or things that go on pegboards, is there signage

4    at the end of that?

5    A.   We have electronic signs, so they're generally right on the

6    peg hook.   They don't get switched out ever.

7    Q.   So these are like permanent signs?

8    A.   They're permanent signs, yeah.

9    Q.   If BestBuy was to change the price on it or put it on sale,

10   what do they do?

11   A.   It automatically changes.   There's Wi-Fi routers around the

12   store that kind of push the reception to the signage and it

13   just updates on its own.

14   Q.   Now, when BestBuy employees do replace the signs, they're

15   called the merchandising team?

16   A.   Yes.

17   Q.   When they do that, put new signs in for a new product, is

18   that documented in any way?

19   A.   No.

20   Q.   How often is the store cleaned?

21   A.   It's cleaned every single day.   We have a cleaning crew

22   that comes in during the morning that thoroughly cleans the

23   entire store, bathrooms, carpet, vacuums, dusting.   And then

24   throughout the day we're in charge of being able, as we do our

25   walks and take care of customers, to acknowledge if something

OBICkamT          DeLeon - Direct

1    needs to be cleaned, if there's a spillage anywhere, we need to

2    make sure the area is being blocked off until it can be

3    properly cleaned immediately, but it gets cleaned every single

4    day throughout the day.

5    Q.   Let's say you were, as a manager, walking around the store

6    and saw a number of signs strewn out on the floor, what, if

7    anything, would you do about that?

8    A.   If that were to happen, we would have to pick them up

9    immediately.

10   Q.   Is there any signage that's put up at the store that's like

11   a plastic type of material or almost like a screen saver that

12   goes over a phone-type material?

13   A.   No.

14   Q.   And you mentioned before that when stuff is put out on the

15   floor, including signage, it's brought out in some sort of

16   cart?

17   A.   Yes.

18   Q.   Can you describe that cart?

19   A.   It's like a two-level cart and then it has four wheels at

20   the bottom.

21   Q.   And that's what the items to be put out are displayed or

22   put on?

23   A.   Yes.

24   Q.   Do you recall, in October 2021, any signage that would be

25   like have metal frames or a mirror-like image?

14

OBICkamT          DeLeon - Cross

1   A.   No.

2            MR. LEVINE:  I have no other questions.  Thank you

3   very much.

4            THE COURT:  Thank you very much.

5            Any cross, Mr. Prisco?

6            MR. PRISCO:  Yes, Judge.

7            THE COURT:  Thank you.  You may proceed.

8   CROSS-EXAMINATION

9   BY MR. PRISCO:

10   Q.   Good afternoon.

11   A.   Good afternoon.

12   Q.   Were you working at the BestBuy store on 23rd Street on

13   October 18, 2021?

14   A.   Most likely.  I was a manager at the store on 23rd Street

15   and Sixth Avenue in October of 2021.

16   Q.   Would it be fair to say you're not 100 percent certain, as

17   we sit here today, whether or not you were working at the

18   BestBuy store on 23rd Street on October 18, 2021, would that be

19   fair?

20   A.   I was most likely working on that day.

21   Q.   Fair enough.

22            On October 18, 2021, what other of your coworkers were

23   working in the BestBuy store on October 18, 2021?

24   A.   We usually have, at a time, around 15 to 20 employees in

25   the location, like scheduled for the day.  So there would have

OBICkamT          DeLeon - Cross

1   been multiple employees scheduled that day.

2   Q.  Would I be correct to say that, as you sit here today, you

3   don't know the names of any of the employees that were actually

4   in fact working at the BestBuy store on October 18, of 2021?

5   A.  I can name you most likely the leadership team that was

6   scheduled that day and some of the regulars we have scheduled

7   throughout the day, as well.

8   Q.  If you were to name those individuals, would I be correct

9   to say that you would be speculating or guessing if those

10  individuals actually were physically working in the store on

11  October 18, 2021?

12  A.  You can say that.  It was a while ago.

13  Q.  On October 18, 2021, what hours did you work in the BestBuy

14  store on 23rd Street?

15  A.  Generally, around that time, I would be scheduled from

16  7:00 a.m. to 4:00 p.m.

17  Q.  I don't want to talk in general.  Do you have a specific

18  recollection, as you sit here today, what hours you worked in

19  the 23rd Street BestBuy store on October 18, 2021?  Yes or no.

20  A.  No.

21  Q.  During your direct examination, you told us there was two

22  merchandising employees, correct?

23  A.  Yes.

24  Q.  And one was Lesley, correct?

25  A.  Yes.

OBICkamT          DeLeon - Cross

1    Q.   Rodriguez Ponce, correct?

2    A.   Yes.

3    Q.   And the other one was Ryan Herder, correct?

4    A.   Yes.

5    Q.   Was Lesley working in the BestBuy store --

6             MR. PRISCO:   Withdrawn.

7    Q.   On October 18, 2021, was Lesley working at the BestBuy

8    store?

9    A.   Yes.

10   Q.   What were her hours that day?

11   A.   I wouldn't be able to tell you exactly, but generally the

12   merchandising team was scheduled from 6:00 or 7:00 a.m. to

13   around 3:30 to 4:00 p.m., as well.

14   Q.   How about Ryan Herder, was Ryan Herder working in the

15   BestBuy store on 23rd Street on October 18, 2021?

16   A.   Yes.

17   Q.   What were Ryan Herder's hours on October 18, 2021, for his

18   shift at the BestBuy store on 23rd Street?

19   A.   It would be probably the same hours.  So either 6:00 or

20   7:00 a.m. until 3:00 to 4:00 p.m.

21   Q.   But again, you're not 100 percent sure if he was actually

22   in fact working in the store on 23rd Street on October 18,

23   2021, correct?

24   A.   Yes.

25   Q.   Back on October 18, 2021, you held the position of

OBICkamT          DeLeon - Cross

1    experience manager for the 23rd Street store, correct?

2    A.   Yes.

3    Q.   As the experience manager for the store, were you familiar

4    with how schedules were set for BestBuy employees at the 23rd

5    Street store?

6    A.   Yes.

7    Q.   The scheduling of employees, is that a written document, is

8    that something on a computer that would indicate to the

9    employees what their hours would have been on October 18, 2021?

10   A.   We utilize a system, a TLC system so everything would be on

11   the computer.

12   Q.   And if you were asked to retroactively go back in time to

13   look which employees of the BestBuy store were in fact working

14   on October 18, 2021, would that have been something you would

15   have been able to do?

16   A.   Yes.

17   Q.   As part of your investigation into this lawsuit, did you

18   look at that system to determine what employees in fact were

19   working and scheduled to work at the 23rd Street store on

20   October 18, 2021?

21   A.   I personally didn't, but I believe that my general manager

22   had in regards to being able to look at the incident and to see

23   if we can ask the employees that were scheduled if they had

24   seen anything.

25   Q.   But again, correct, you did not do any investigation to

OBICkamT          DeLeon - Cross

1   determine what employees worked in the 23rd Street store on

2   October 18, 2021, correct?

3   A.  Only in the system if something was reported or not.

4   Q.  Back in October 2021, the manager of the store was Daimeon

5   Dowden, correct?

6   A.  The general manager.

7   Q.  What are the differences in responsibilities between a

8   general manager, back in 2021 for the 23rd Street store, and an

9   experience manager?

10  A.  Well, the general manager is responsible for the overall

11  business, the overall store, and being able to communicate

12  everything that's going on in the store to our directors and

13  different market managers and cascade information down to the

14  store in regards to promotions, strategies, changes that are

15  happening.  As experience managers, we kind of get that

16  information and we formulate a plan to kind of go forward and

17  set that expectation with our employees.

18  Q.  Would I be correct to say that the general manager is

19  superior to the experience manager?

20  A.  Yes.

21  Q.  Earlier in your testimony, you indicated to us that if

22  employees of the BestBuy store witnessed or observed a customer

23  have an accident in the store, they would be obliged to report

24  it to a manager of the store, correct?

25  A.  Yes.

OBICkamT          DeLeon - Cross

1    Q.   Would that include an experience manager or would that only

2    be the general manager?

3    A.   It's all employees.

4    Q.   When you say "all employees" -- let me rephrase the

5    question.

6              Non-managerial positions, what does BestBuy call them?

7    A.   I think they're called advisors.

8    Q.   "Advisors" is the term?

9    A.   Uh-huh.

10   Q.   Would I be correct to say, back on October 18, 2021, if any

11   advisors observed an accident in the store and the customer

12   didn't want to make an accident report, that the advisor would

13   be obliged to report that accident to a superior at BestBuy?

14   A.   Yes.

15   Q.   And the superior that they would be obliged to make that

16   report to would be who?

17   A.   It would be any manager on duty, so whether it be a

18   supervisor, a manager, or the general manager.

19   Q.   Would that include an experience manager or no?

20   A.   Yes.

21   Q.   So during a regular shift at BestBuy back in 2021, would

22   there be something called a manager on duty?

23   A.   Yes.

24   Q.   And that manager on duty could be a general manager, it

25   could be an experience manager, or some other managerial

OBICkamT          DeLeon - Cross

1    position, correct?

2    A.   Yes.

3    Q.   Back on October 18, 2021, who was the manager on duty?

4    A.   It would have most likely been myself, if not my

5    counterpart, which was Mike Mianfante.

6    Q.   If we wanted to determine who the manager on duty was on

7    October 18, 2021, would I be correct that we could look at the

8    computer system and make that determination?

9    A.   Yeah.

10   Q.   And again, you didn't do that before coming here today?

11   A.   No.

12   Q.   Are you aware of any occasion, prior to October 18, 2021,

13   where an employee of BestBuy observed a customer have an

14   accident and they failed or they mistakenly did not report it

15   to their supervisor?

16   A.   No.

17   Q.   Could you be 100-percent certain that that has never

18   occurred prior to October 18, 2021, where a BestBuy employee

19   sees a customer have an accident, but they fail to actually

20   follow protocol and report it to a superior?

21   A.   To my knowledge, no.

22   Q.   The lower level of the store at this BestBuy store on

23   23rd Street, were there cellphones being sold at that level?

24   A.   Can you repeat the question.

25   Q.   Sure.  On October 18, 2021, the lower level of the BestBuy

OBICkamT          DeLeon - Cross

1   store, were there cellphones displayed at that level, the lower

2   level?

3   A.   Yes.

4   Q.   Where were the cellphones located in particular in the

5   lower level of the BestBuy?

6   A.   It would be downstairs to the right when you get off on the

7   landing.

8   Q.   In order to get from the sidewalk into the BestBuy, you

9   would walk through doors, correct?

10  A.   Yes.

11  Q.   And then to get to the lower level, how would you do that?

12          MR. PRISCO:  Let me withdraw the question.  I

13  apologize.

14  Q.   How would a customer do that, if a customer were to enter

15  the BestBuy on October 18, 2021, what means would they have to

16  go from the street level to the lower level of the store?

17  A.   So, when you come into the store, you would either take the

18  escalator or the stairs down to the lower level.  We also had

19  an elevator available that you could take to the lower level.

20  Then, if you're getting off the stairs, on the right-hand side,

21  you would get to the mobile department.

22  Q.   In the lower level of the store on October 18, 2021, were

23  there signs displayed throughout the lower level?

24  A.   Yes.

25  Q.   Specifically, what signs were displayed throughout the

OBICkamT          DeLeon - Cross

1    lower level of the store on October 18, 2021?

2    A.   We have signs where it shows you, like, products that we

3    sell.   There's also signs in regards to descriptions of

4    specific brands.   And then we have signs, for example, like the

5    electronic shelf labels where it would show you the price, and

6    then smaller signs, for example, that will show you, like,

7    financing offers, for example, or if a product is available or

8    not.

9    Q.   Would you agree with me, yes or no, that on October 18,

10   2021, in the lower level of the store, there were essentially

11   four types of signs, signs with pictures of product, electronic

12   signs, vendor signs that would be like Apple, Google,

13   et cetera, and small slip signs?

14   A.   Yes.

15   Q.   On October 18, 2021, would you agree with me that you don't

16   know specifically what type of vendor signs were displayed in

17   the lower level of the store?

18   A.   I can probably name you, like, specific signs that we

19   always have because they don't change very often.

20   Q.   But could you do that without guessing is what I'm asking.

21   A.   Like, 100 percent?

22   Q.   Like, 100 percent, yes.

23   A.   100 percent, no.   But I could give you probably like a 90

24   or 80 percent because they don't change very often.

25   Q.   How about the signs that display pictures of product, back

OBICkamT          DeLeon - Cross

1    on October 18, 2021, can you tell us, without guessing, what

2    type of signs were displayed in the lower level of the

3    23rd Street store that were the type of signs that were

4    pictures of product?

5    A.   No.

6    Q.   And same question with the electronic signs or the small

7    slip signs.  Could you tell us today with, 100-percent

8    certainty, what type of electronic signs or small slip signs

9    were displayed in the lower level of the BestBuy store on

10   October 18, 2021?

11   A.   Can you, like, rephrase the question.  I didn't understand.

12         MR. PRISCO:   Absolutely.

13   Q.   Can you tell us today, with 100-percent certainty, what

14   type of small slip signs and electronic signs were displayed in

15   the lower level of the BestBuy store on October 18, 2021?

16   A.   Those are just two types of signs.  So those are the only

17   two, for example.

18   Q.   Do the small slip signs say anything on them?

19   A.   They would be for, like, the product itself, for example.

20   So if it's an item that we keep behind a register, it would be

21   a small sign that customers can take over to a register to

22   purchase.  And then the electronic signs, they're there the

23   entire year.

24   Q.   Would I be correct to say that depending on what day, which

25   season potentially are in the BestBuy store on 23rd Street,

OBICkamT          DeLeon - Cross

1    that the small slip signs would be saying something different

2    depending on the given day?

3    A.   No.

4    Q.   So the small slip signs that existed in the BestBuy store

5    on October 18, 2021 would be displaying the same thing that the

6    small slip signs would be displaying today in the 23rd Street

7    store?

8    A.   It would be the same type of sign, yes.

9    Q.   Would it be saying the exact same thing on October 18, 2021

10   as it is today?

11   A.   It would be, like, an updated version of the same product.

12   Q.   In other words, there would be some variation depending on

13   what day you're in the store, correct?

14   A.   Not the day of the store because, again, those signs don't

15   really change throughout.

16   Q.   The signs that show pictures of the product, in general,

17   what size or dimensions do those signs come in?

18   A.   They're probably no bigger than, like, an iPhone, maybe a

19   little bit bigger than an iPhone.  They're not very big.

20   Q.   Do the sizes of those types of signs vary depending on what

21   the type of product is?

22   A.   No.  They're generally around the same size.  So maybe a

23   little bit bigger than an iPhone.

24   Q.   And the signs that show pictures of product, am I correct

25   that it would be BestBuy employees that would bring those signs

OBICkamT          DeLeon - Cross

1  out onto the sales floor and set those signs up where they

2  needed to be set up?

3  A.  It would either be a BestBuy employee or a vendor, yes.

4  Q.  And who typically does that, is it more likely that a

5  vendor would do that --

6        MR. PRISCO:  Withdrawn.

7  Q.  When you use the term "vendor," is vendor someone that is

8  not employed by BestBuy?

9  A.  Yes.

10  Q.  And these signs that are pictures of product, typically, is

11  that the BestBuy employees that put out those kind of signs or

12  is that these vendors that are not BestBuy employees that put

13  out those signs?

14  A.  BestBuy employees would put out the signs.

15  Q.  In your career working at the 23rd Street store --

16        MR. PRISCO:  Withdrawn.

17  Q.  Before October 18, 2021, how long had you worked at the

18  BestBuy store on 23rd Street?

19  A.  I had only worked at that location until probably a year

20  and a half ago.  That was my main location.

21  Q.  Just going to rephrase the question again.  So what I'm

22  asking is, so you were an employee of the 23rd Street store on

23  October 18, 2021, right?

24  A.  Yes.

25  Q.  Before October 18, 2021, how long had you been working for

OBlCkamT          DeLeon - Cross

1    that location, that store on 23rd Street?

2    A.   Since 2009.

3    Q.   So from 2009 through October 18, 2021, you worked in the

4    23rd Street store, correct?

5    A.   Yes.

6    Q.   Daimeon Dowden, how long had he been the general manager of

7    the 23rd Street store before October 18 of 2021?

8    A.   I think it might have been, like, two years already.

9    Q.   In your opinion, was Daimeon Dowden a knowledgeable general

10   manager of the 23rd Street store?

11   A.   Yes.

12   Q.   And his testimony about how and when and size of the

13   signs --

14            MR. PRISCO:  Withdrawn.

15   Q.   Are all the four signs that we discussed, do they all get

16   delivered to the store in the same type of packaging or does

17   the packaging vary?

18   A.   No, those are four types of signs.  The electronic labels,

19   those are really small.  Again, they're barely the size of a

20   key chain.  They don't get delivered the same way a sign would

21   generally get delivered because it's not really a sign.

22   Q.   The signs for the pictures of product, typically, what type

23   of packaging did those signs arrive to the store in?

24   A.   It would either be in an envelope or they would be

25   individually packaged in like a small, flat cardboard box.

OBICkamT          DeLeon - Cross

1  Q.  Before October 18, 2021, had you ever unpackaged signage

2  that gets delivered to the store, whether it's the pictures of

3  product, electronic signs, vendor signs, small slip signs?

4  A.  As part of my training, yes.

5  Q.  How long did your training last?

6  A.  It's ongoing.  We're always doing new trainings every

7  single week.

8  Q.  Unpackaging signage at the 23rd Street store, was that

9  typically part of your day-to-day responsibilities?

10  A.  No.

11  Q.  That would be the merchandising team, correct?

12  A.  Yes.

13  Q.  That would be Lesley and Ryan, correct?

14  A.  Yes.

15  Q.  You would agree with me that you didn't work with signs

16  very often at your time at the 23rd Street store, correct?

17  A.  I have.  As a manager, it's part of my responsibility to

18  oversee that they're doing it properly.

19  Q.  But you, yourself, would you ever --

20         MR. PRISCO:  Withdrawn.

21  Q.  What is the proper manner to put out the signs at the 23rd

22  Street store in the lower level?

23  A.  They would receive them and it would be done, again,

24  probably 7 o'clock in the morning.  They would roll it out on

25  their cart and replace the sign.  Usually it would be like one

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OBICkamT          DeLeon - Cross

1   at a time, but again, it would be very rarely done.

2   Q.  If signs were being put up during customer hours, meaning

3   while customers were shopping in the store, what would be the

4   protocol for the employees putting out those signs?

5   A.  It would maybe be like a small sign.  We wouldn't change

6   any big signs during the store hours.

7   Q.  Before October 18, 2021, did you ever observe the BestBuy

8   employees putting out signs that were between two feet, a foot

9   in dimension?

10  A.  Before the store opens, yes.

11  Q.  No.  During customer hours.

12  A.  Very rarely.

13  Q.  So in other words, from time to time, that would happen at

14  the 23rd Street store, correct?

15  A.  Very rarely, again.

16  Q.  On those occasions where those types of signs are being put

17  out, whether they were two feet, one foot, during customer

18  hours, what is the protocol for the employees while they're

19  putting up those signs?

20  A.  The protocol would be, again, that we do it before the

21  store opens.

22  Q.  But I just want to talk about the occasions --

23          MR. PRISCO:  Withdrawn.

24  Q.  If I understand you correctly, rarely, but it happens,

25  during customer hours at the 23rd Street store, signs would be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OBICkamT          DeLeon - Cross

1    put up and displayed by the BestBuy employees; am I correct to

2    say that?

3    A.   Not signs.  Maybe a sign.  We wouldn't do multiple signs

4    during store hours.  We wouldn't be able to.  It's a big

5    undertaking when we do multiple signs.

6    Q.   When you say "not big signs," what do you mean by "not

7    big," like what size?

8    A.   Maybe like the size of, like, a regular letter.  I don't

9    know the paper dimensions.  Like a regular print ad sign where

10   we would be displaying like a promotion that's going on.

11   Usually it's like a printed copy of an item.

12   Q.   While the BestBuy employees are putting up signs during

13   customer hours, is there any safety protocol involved in that?

14   A.   We wouldn't put up signs while customers are in the

15   building.

16   Q.   So is it the testimony that back in 2021 and prior to

17   October 18, 2021, there would never be an occasion when BestBuy

18   employees brought signs out and put them up in the store while

19   customers were present in the store?

20   A.   Not bigger signs.  Again, it would just be small signs,

21   something that's printed from a printer, just displaying a

22   promotion that is just announced.

23   Q.   So if Daimeon Dowden testified that signs rarely, but

24   sometimes, would be brought out and displayed by employees of

25   BestBuy, you would disagree with his testimony?

OBICkamT          DeLeon - Cross

1   A.   It would be smaller signs.  Again, it wouldn't be the ones

2   that come in the bigger poster boards that are individually

3   sent to the store.

4   Q.   To the extent that BestBuy employees are bringing out these

5   smaller signs that you described about the size of a letter, is

6   there any safety protocol involved in that where they're

7   putting up those signs while customers are in the store?

8   A.   They were generally just unboxed like the envelope and

9   bring it over to the floor and put it on the counter space.

10  That's usually where we would display a smaller sign, like, by

11  a register.

12  Q.   Earlier you were talking about video within the store,

13  correct?

14  A.   Yes.

15  Q.   The lower level of the store, on October 18, 2021, would I

16  be correct that there were video surveillance cameras depicting

17  or capturing each aisle of the store?

18  A.   Yes.

19  Q.   Were there aisles in the lower level of the store that were

20  not captured or recorded by a camera?

21  A.   No.

22  Q.   In other words, there were no blind spots, correct?

23  A.   No.

24  Q.   As the experience manager, back on October 18 of 2021, did

25  you have access or the ability to save video footage from the

OBICkamT          DeLeon - Cross

1   store yourself?

2   A.   Yes.

3   Q.   And what would be the process of saving video footage from

4   the BestBuy store on October 18, 2021?

5   A.   It would be the same process that we have in place today.

6   We use a Genetec system.  We would go back and kind of choose

7   the date, choose time, and we can save whatever information we

8   need to onto what they call the vault or we can save it onto a

9   flash drive.

10  Q.   Before October 18, 2021, had you ever gone through that

11  process of saving video recording from the store?

12  A.   Yes.

13  Q.   Would I be correct to say that if you wanted to obtain

14  video footage for a greater length of time, more than 30 days

15  past a particular date, that you could put in a request from

16  BestBuy corporate to obtain that video footage?

17  A.   No.

18  Q.   Have you ever asked?

19  A.   We have.

20  Q.   On what occasions, prior to October 18, 2021, had you asked

21  BestBuy corporate if they could access video recordings of the

22  23rd Street store for a greater length of time, greater than

23  that window of 30 days from a particular date?

24  A.   It was more so involved in regards to product that couldn't

25  be located.  We were curious and we had asked the question if

OBICkamT          DeLeon - Cross

1    it was possible to do so.

2    Q.  And as a result of this accident, when you did an

3    investigation into this accident -- I'm correct you started

4    your investigation in 2023, correct?

5    A.  Correct.

6    Q.  Do you know what year this lawsuit was started?

7    A.  No.

8    Q.  Do you know if this lawsuit was started before 2023?

9    A.  No.

10   Q.  As part of your investigation — into this accident — that

11   you performed in 2023, did you make any requests, written or

12   otherwise, to BestBuy corporate to determine whether or not

13   they were able to access any video footage from the lower level

14   of the BestBuy store on 23rd Street?

15   A.  No.

16   Q.  As part of your investigation that you performed in 2023

17   into this accident, did you interview any BestBuy employees?

18   A.  No.

19   Q.  Would you agree with me that if larger types of signs were

20   being put up during customer hours, that it would be improper,

21   against policy of BestBuy to leave some of those signs loose on

22   the floor while the workers were working on them?

23   A.  It would be improper, yes.

24   Q.  Why would it be improper?

25   A.  Because we do that before the store opens and we have a

OBICkamT          DeLeon - Redirect

1  cart that we put everything on.

2  Q.  Would it be a slipping hazard?

3  A.  Not necessarily.  If we're talking about the bigger signs,

4  for example, they're made out of cardboard.  Again, the smaller

5  size, they're very -- again, it's like a piece of paper at a

6  time that we would be replacing.  But we have the time

7  scheduled in order to be able to get those kinds of

8  responsibilities done.

9          MR. PRISCO:  I have no further questions.  Thank you.

10          THE COURT:  Thank you.

11          Any redirect?

12          MR. LEVINE:  Yes.  Very brief, your Honor.  Thank you.

13  REDIRECT EXAMINATION

14  BY MR. LEVINE:

15  Q.  Now, if both Lesley Rodriguez Ponce and Ryan Herder were

16  not working on October 18, 2021, they were out for whatever

17  reason, day off, sick day, whatever, in that situation, would

18  any signage be put up?

19  A.  Depends if it was something that was timely, if not, no.

20  Q.  If it was timely, how many would that be, how many signs

21  would we be talking about?

22  A.  It would be, like, one.

23  Q.  If it wasn't timely and they weren't in, no signs would get

24  put up that day?

25  A.  No.

OBICkamT            DeLeon - Recross

1    Q.  You would have to wait until they get back?

2    A.  Yes.

3    Q.  Was anyone else on the merchandising team back then on

4    October 18, 2021, other than Lesley and Ryan?

5    A.  We had one other individual that would help out, as well.

6    His name was Victor.

7    Q.  Is Victor still with BestBuy?

8    A.  No.

9            MR. LEVINE:  I have no other questions.  Thank you.

10           THE COURT:  Thank you very much.

11           Any recross?

12           MR. PRISCO:  Very briefly.

13   RECROSS EXAMINATION

14   BY MR. PRISCO:

15   Q.  What is Victor's last name?

16   A.  Garcia.

17   Q.  Would it be correct to say that if signs were being put up

18   during customer hours at the BestBuy store on October 18, 2021,

19   that it would have either been Victor Garcia, Lesley Rodriguez

20   Ponce, or Ryan Herder?

21   A.  We wouldn't have put them up during store hours.

22   Q.  Assuming signs were being put up during store hours on

23   October 18, 2021, would I be correct to say that the BestBuy

24   employees that would have been putting up those signs would

25   have been Victor Garcia, Lesley Rodriguez Ponce, or Ryan

OBICkamT          DeLeon - Recross

1   Herder?

2   A.   Yes.

3             MR. PRISCO:   No further questions.

4             THE COURT:   Thank you.   You may step down.

5             (Witness excused)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**23-cv-00033-JLR Kamel v. Best Buy Co., Inc.**

**Date:** 11-20-2024

**Time:** 1:00 PM

**Signature of Foreperson:**

We have reached the verdict.

EXHIBIT
15
11/20/2024
PENGAD-Bayonne, N.J.

**Court Exhibit 7**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WALID KAMEL,

                    Plaintiff,

          -against-

BEST BUY CO., INC.,

                  Defendant.

Case No. 23-cv-00033 (JLR)

JENNIFER L. ROCHON, United States District Judge:

## **SPECIAL VERDICT FORM**



**Court Exhibit 7**

**Please answer each question in order and follow the instructions before moving to the next question.  All answers must be unanimous.**

## QUESTION 1

Did Plaintiff fall at the Best Buy store at 60 West 23rd Street on October 18, 2021?

CHECK ONE: YES_____✓_____          NO_____

*If your answer is YES, proceed to Question 2.*

*If your answer is NO, do not answer any additional questions, and proceed to the last page of the verdict form and the foreperson should sign the verdict form and alert the Marshal.*

## QUESTION 2

Was defendant Best Buy negligent?

CHECK ONE: YES_____✓_____          NO_____

*If your answer is YES, proceed to Question 3.*

*If your answer is NO, do not answer any additional questions, and proceed to the last page of the verdict form and the foreperson should sign the verdict form and alert the Marshal.*

## QUESTION 3

Was the negligence of defendant Best Buy a substantial factor in causing the plaintiff's accident?

CHECK ONE: YES_____✓_____ NO_____

*If your answer is YES, proceed to Question 4.*

*If your answer is NO, do not answer any additional questions, and proceed to the last page of the verdict form and the foreperson should sign the verdict form and alert the Marshal.*

**Court Exhibit 7**

## QUESTION 4

Was plaintiff Walid Kamel negligent?

CHECK ONE: YES_____    NO_____✓____

*If your answer is YES, proceed to Question 5.*

*If your answer is NO, <u>do not answer any additional questions</u>, and proceed to the last page of the verdict form and the foreperson should sign the verdict form and alert the Marshal.*

## QUESTION 5

Was the negligence of plaintiff Walid Kamel a substantial factor in causing the accident?

CHECK ONE: YES_____    NO_____

*If your answer is YES, proceed to Question 6.*

*If your answer is NO, <u>do not answer any additional questions</u>, and proceed to the last page of the verdict form and the foreperson should sign the verdict form and alert the Marshal.*

## QUESTION 6

What was the percentage of fault of the defendant and what was the percentage of fault of the plaintiff?

DEFENDANT:          _____%

PLAINTIFF:          _____%

**Total must be 100%.**

*Please proceed to the last page of the verdict form.*

Court Exhibit 7

**You have completed all questions.  Please proceed to the signature line below.**

**SIGNATURE LINE**

If this verdict form reflects the unanimous verdict of all jurors, the foreperson shall sign and date the verdict sheet.  Then, without disclosing your verdict, advise the Marshal, that you have reached a verdict and are ready to return to the courtroom to announce your verdict.

_____
Foreperson

Dated:    _11 / 20 / 2024_____